**Kaven L. RUMPEL, Appellant**

v.

**Kathie W. RUMPEL (Now Wolford) and Diana L. Skaggs, Appellees.**

No. 2012–SC–000563–DG.

Supreme Court of Kentucky.

Aug. 21, 2014.

William Dennis Sims, James Gregory Troutman, Counsel for Appellant.

Eric Griffin Farris, Lee Remington Williams, Kimberly M. Maraman, Counsel for Appellees.

Opinion of the Court by Justice ABRAMSON.

By decree, the Bullitt Circuit Court dissolved the marriage of Kaven and Kathie Rumpel (now Kathie Wolford), restored to the parties their non-marital property, apportioned between them the marital debts and assets, and awarded Kathie both maintenance and attorneys' fees. The Court of Appeals rejected Kaven's numerous allegations of error and affirmed the trial court's judgment in its entirety. Kaven then sought and was granted discretionary review for this Court to consider his claims that the trial court erred by awarding attorneys' fees as a discovery sanction and by substantially amending, in response to Kathie's post-trial motion, its judgment regarding the value of the principal marital asset, a commercial strip-mall and an associated business that hosts charitable gaming functions. Agreeing with Kaven that the post-judgment amendment amounted to an abuse of the trial court's discretion

under Kentucky Rule of Civil Procedure (CR) 59.05, and agreeing further that the award of attorney's fees must be readdressed by the trial court, we reverse the Court of Appeals' Opinion on these issues, and remand this matter to the circuit court with instructions.

## RELEVANT FACTS

Kaven and Kathie were married in August 1994. Kaven was employed at the time by the Louisville Police Department. He retired from the police department with a full pension in June 1996. At about that same time, Kaven, together with a business partner, Neil Alioto, formed a sub-chapter S corporation they called Advantage Associates, Inc. Advantage purchased a four-plus acre commercial property on Fegenbush Lane in south Louisville. The property had been improved with a small strip mall, and in addition to renting space to three unaffiliated businesses, one of which was a tavern, Advantage used the lion's share of the mall space to house two adjoining bingo halls. Advantage rents the bingo halls to charitable organizations for the purpose of charitable gaming. Within the halls, Advantage also maintains kitchen facilities from which it sells snacks and beer to the bingo patrons. In 1998, to separate its role as owner/landlord from its role as bingo-hall proprietor, Advantage formed a subsidiary, Highview Manor Associates, LLC,[1] and transferred the realty to it.

Also in 1998, Kathie gave up her job with Columbia HCA and began devoting more of her time to homemaking. This included helping to care for Kaven's grandson, custody of whom was eventually awarded to Kathie and Kaven in August 2001.

In January 2006, one of Advantage's former employees pled guilty to two counts of felony theft and admitted that she had stolen in excess of $300,000.00 from the company. She was ordered to make restitution at the rate of $2,000.00 per month, although it appears that by December 2008 the company was receiving a net monthly payment of $1,140.00. At that time—December 2008—Kaven and his business partner Alioto agreed to sever their relationship. As consideration for Alioto's interest in Advantage and its subsidiary, Kaven agreed that Advantage would pay Alioto $22,500.00 immediately, would assign to him the company's right to the former employee's restitution payments, would supplement any restitution payment received by an additional $160.00, and would guarantee Alioto's receipt by the end of the restitutionary period of not less than $100,000.00 in such payments.

A few months after Kaven acquired Alioto's share of the business, in April 2009, he and Kathie separated. On April 20, Kathie petitioned for dissolution and on April 28, Kaven counter-petitioned for the same. On October 28, 2009, Kathie moved pursuant to KRS 403.220 for a preliminary award of attorney's fees. In January 2010, the trial court, having set the matter for trial on April 21, 2010, and having not been shown that Kaven had the wherewithal to pay fees, "reserve[d] ruling on Petitioner's motion for attorney fees to the conclusion of this action." On March 1, 2010, Kathie requested Kaven to provide, among other things, updated financial statements for the businesses (2008 was the last year accounted for), and she requested him to admit both that he had agreed to pay "the other shareholder" (Alioto) $132,500.00 for his 50% share of the businesses, and that, in light of the deal with Alioto, Kaven's 100% interest in the businesses was worth

---

1. This company also appears in the record as Hi–View Manor Associates, LLC.

"$265,000 as of December 9, 2008." In his March 23, 2010 response, Kaven denied both of these statements of purported fact and asserted that more recent financial statements were not available.

On March 25, 2010, Kaven moved for a continuance. He explained that, hoping for a mediated settlement, he had postponed having the businesses appraised, but mediation had (that day) failed, and he therefore needed additional time for appraisals. The motion was granted, and the matter was continued to June 3, 2010. On May 18, 2010, Kathie moved for a continuance on the ground that Kaven had not complied with discovery requests to disclose his appraisers' reports and on the additional ground that she needed time to acquire her own appraisal of the business realty. She indicated that she had recently been made aware that the appraiser who prepared the appraisal upon which she had planned to rely considered himself a friend of both parties and did not want to testify. Kathie's motion, too, was granted, and the trial was rescheduled for November 4, 2010, both parties being ordered to "fully and completely" disclose testifying experts' opinions by the end of July. When a scheduling conflict arose for Kathie's counsel, the trial was moved up, finally, to October 28–29, 2010.

Both parties ultimately obtained separate appraisals of the business realty and Advantage. Kathie's appraisers opined that as of December 2008 the realty had a value of $1.4 million, which was to be offset by Advantage's long-term debts (primarily, but not exclusively, the mortgage on the realty) of about $1.37 million, leaving Advantage with an equity of $28,641 in its realty. That amount was in addition to the going concern value of the bingo/snack-bar business, which Kathie's appraiser opined was $354,600, giving Advantage a total value, according to Kathie's experts, of about $383,000.

Kaven's experts painted a much gloomier picture. According to his real estate appraiser, the realty had been mortgaged more than $500,000 beyond its $810,000 value, and according to his business appraiser the bingo business was a loser. Accepting the $810,000 real estate appraisal, a net-asset appraisal of Advantage yielded a business value of negative $455,000. And accepting Advantage's income tax returns as accurately reflecting its earnings—the company claimed losses in three of the four years used in the appraisal—a capitalized earnings appraisal suggested a business value of about negative $122,000. Averaging these amounts, Kaven's expert opined that Advantage was worth about negative $289,000.

In accord with Kathie's experts, the trial court found that as of the end of 2008, Advantage was worth about $383,000. Casting doubt on Kaven's appraisals, the trial court noted, was evidence that on more than one occasion during the relevant time period a bank had independently appraised the realty as worth in excess of $1.5 million, evidence that Kaven himself had thought Advantage worth acquiring from Alioto for a substantial sum, and evidence that the income data upon which Kaven's experts relied did not include accurate amounts for the cash-based snack-bar part of the business.

At the conclusion of trial, the trial court asked both sides to submit proposed findings of fact and conclusions of law. Among Kathie's proposed findings was the following:

> The Court finds that Respondent [Kaven] was requested to admit, pursuant to CR 36 that his interest in Advantage and Highview was valued at $265,000 as of December 9, 2008 and the Court herein has found a higher value. Thus, un-

der CR 37.03, Respondent is liable for Petitioner's reasonable expenses in making that proof, including attorney fees. The Court further finds that the bulk of Petitioner's expenses have related to that issue.

The Court further finds, after considering the provisions of [Kentucky Revised Statute] KRS 403.220, that Respondent shall pay $50,000 to Petitioner and her attorneys, within 30 days from date hereof.

The trial court adopted this proposed finding almost verbatim, and its judgment thus included an award of $50,000 in attorney's fees to Kathie. The judgment also found, in effect, that the marital estate was worth in excess of $600,000, awarded most of the assets, including the businesses, to Kaven, ordered him to pay Kathie $246,000 to equalize their shares, and awarded Kathie maintenance of some $3,100 per month for six years.

Both parties filed motions to alter or amend the judgment. Kaven's motion concerned his contention that he should be given credit for having paid down certain marital debts during the pendency of the divorce action. The trial court denied that motion, and the Court of Appeals affirmed the denial. The Court of Appeals noted that while Kaven had indeed paid the specified marital debts, he had used marital funds to do so and thus was not entitled to reimbursement. Kaven has not challenged that aspect of the Court of Appeals' ruling.

Kathie's CR 59.05 motion asked the trial court to amend its valuation of Advantage in light of evidence introduced at trial to the effect that since the valuation date of December 2008, the mortgage debt on the business realty had been reduced, according to Kathie, by some $175,000. That apparent increase in the business realty's equity, she claimed, effected a dollar-for-dollar increase in the value of Advantage, and thus required that her share of the marital property be increased by half that amount, or about $87,500. Kaven objected on the ground that the motion was not timely—Kathie having known about the reduced mortgage debt well before trial— and on the ground that expert opinion would be required to determine what effect, if any, the debt reduction had on the value of Advantage. The trial court agreed with Kathie, however, and amended its Judgment to require Kaven to pay Kathie $333,700, as opposed to $246,000, so as to equalize their shares of the marital property.

Before the Court of Appeals, Kaven challenged, among other rulings, both the trial court's award of attorney's fees and its post-trial increase in the value of Advantage. With respect to the fee award, Kaven argued that the trial court had not made findings sufficient to invoke either CR 37.03 or KRS 403.220. With respect to the post-trial revaluing of Advantage, Kaven argued that the purportedly new evidence concerning the reduced debt on the business realty was neither new, timely, nor sufficient to support the trial court's ruling.

Affirming on both issues, the Court of Appeals held that the fee award was within the trial court's discretion under KRS 403.220 and thus that any doubts about its invocation of CR 37.03 were moot. It also upheld the business-valuation increase in light of the trial court's observation that prior to trial Kaven had failed to provide in a timely manner updated financial and tax records despite requests that he do so.

We granted discretionary review primarily to consider Kaven's claim that the trial court's award of attorney's fees confused and improperly intermixed the different standards for fee awards under CR 37.03 and KRS 403.220. We will also address Kaven's contention that Kathie im-

properly used CR 59.05 to raise belated business-valuation issues that she could and should have raised at trial or earlier.

## ANALYSIS

■ Generally, Kentucky courts apply the so-called American Rule regarding attorney's fees. That rule requires parties to pay their own fees and costs and does not allow, as in the English courts, for the shifting of the prevailing party's fees to the loser. *Bell v. Commonwealth*, 423 S.W.3d 742 (Ky.2014); *AIK Selective Self-Insurance Fund v. Minton*, 192 S.W.3d 415 (Ky.2006). There are, however, exceptions to the rule and this case involves two of them, CR 37.03 and KRS 403.220. The trial court's relevant findings refer to both, but because it based its fee award primarily on what it perceived as Kaven's violation of the rules governing requests for admission, we begin with those rules.

## I. The Trial Court Misapplied CR 37.03 When it Imposed a Fee Sanction For a Party's Refusal to Admit a Fact Genuinely in Dispute.

■ The trial court found that Kaven violated CR 36.01. That rule permits one party to request another party to admit "the truth of any matters within the scope of Rule 26.02 [the rule defining what is discoverable]." Under the rule, the party receiving the request must, in a timely manner, either admit the matter asserted, deny it, or object to the request. The purpose of the rule is to streamline the litigation by eliminating from controversy factual matters that will not be disputed at trial. *Thompson v. King Feed & Nutrition Service, Inc.,* 153 Wash.2d 447, 105 P.3d 378, 390 (2005) (discussing Washington's virtually identical rule); *Dobos v. Ingersoll,* 9 P.3d 1020, 1028 (Alaska 2000) (discussing Alaska's version of the rule).

Under CR 37.03, an improper failure to admit the matter asserted, if the requesting party thereafter proves the truth of it, authorizes the trial court, upon the requesting party's application, to order "the other party to pay him [the requesting party] the reasonable expenses incurred in making that proof, including reasonable attorney's fee." [2] CR 37.03 thus provides an exception to the American Rule against the shifting of fees. Because CR 36 and CR 37.03 apply to civil proceedings generally, the fee shifting they allow is potentially of far-reaching effect. Indeed, if under those rules a party could obtain a fee award merely by requesting prior to trial that a disputed fact be admitted and then,

---

**2.** We note that the alleged discovery violation at issue was neither raised nor vetted in the trial court as envisioned by the rules. CR 37.03 permits the party who subsequently proved a matter sought to be admitted to "apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees." Kathie's only "appl[ication] ... for an order" was the inclusion in her proposed findings of fact of a finding that Kaven had breached CR 36.01 and as a result was liable for virtually all of Kathie's attorneys' fees. While the rule does not say that "appl[ication] ... for an order" must be made by way of a motion, a motion would ensure that the matter was thoroughly addressed by both parties, given the respon-

dent's right to respond, and would have been preferable to the oblique approach Kathie employed. For his part, on the other hand, Kaven did not object to Kathie's proposed finding beyond submitting his own proposed finding to the effect that neither party be awarded fees. Even when the trial court adopted Kathie's finding and sanctioned him, Kaven did not, in his CR 59.05 motion, address to the trial court any of the objections he has raised on appeal. Neither party, in other words, developed this issue as thoroughly as it could and perhaps should have been developed. Nevertheless, Kaven's proposed findings of fact countered Kathie's on this point and were enough, if just barely so, to preserve the issue for appeal.

if the fact were denied, prevailing on the dispute at trial, prevailing parties would be routinely entitled to fee awards, and our approach to fee shifting would be turned on its head. *Cf. Piney Meeting House Investments, Inc. v. Hart,* 284 Va. 187, 726 S.E.2d 319 (2012) (disallowing under Virginia's version of CR 37 a request intended merely to subvert the American Rule).

That clearly is not the intent of the rules allowing for fee sanctions. *See Bell,* 423 S.W.3d at 742 (noting that rules allowing for fees as a sanction must be narrowly construed precisely to prevent this sort of subversion of the American Rule). On the contrary, CR 37.03 provides that, even if the requesting party proves the truth of a matter concerning which an admission was requested and denied, a fee sanction is not appropriate if

 (a) the request was held objectionable pursuant to Rule 36.01, or

 (b) the admission sought was of no substantial importance, or

 (c) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or

 (d) there was other good reason for the failure to admit.

CR 37.03.

■ The rule does not require, in other words, that a party admit a genuinely disputed fact or risk having to pay fees should the fact-finder ultimately decide the dispute against him. Prevailing at trial, although necessary to invoke the rule, is not the sole issue. The main issue under the rule, rather, is whether the party denying a request for admission acted reasonably in believing that he might prevail,

or had some other legitimate reason for making the denial. We review a trial court's grant or denial of discovery sanctions, including fee awards, for abuse of discretion, *Turner v. Andrew,* 413 S.W.3d 272 (Ky.2013), and we agree with Kaven that the trial court abused its discretion here by failing to consider whether Kaven's denials of Kathie's requests for admission were justified.

As previously noted, Kaven acquired his partner, Neil Alioto's, one-half interest in Advantage and Highview by agreeing that Advantage would pay Alioto a lump sum of $22,500, would assign to him the company's right to a former employee's monthly restitution payments, would add $160 to any such payment received, and would guarantee Alioto's receipt, by the end of the restitutionary period, of payments totaling at least $100,000. The agreement thus, on its face, guaranteed that Alioto would eventually receive at least $122,500 for his one-half interest in Advantage and Highview.

Based on this agreement, Kathie, pursuant to CR 36.01, requested Kaven to admit that in December 2008 he had agreed to pay his partner at least $132,500 for the partner's 50% interest in the businesses, not $122,500,[3] and, further, to admit that, as of that date, his 100% interest in the businesses was worth twice that amount, or $265,000, not $245,000, which would have been twice the agreement's actual face value. Kaven denied both requests for admission, and when asked by way of interrogatory to explain his denials, he simply referred Kathie to the agreement itself.[4]

---

**3.** The record does not indicate, at least not readily, and Kathie's brief does not explain, why she thought the agreement worth $10,000 more than its face value.

**4.** Kathie's interrogatory asked, "If your response to either of the foregoing requests for admissions is denied (sic), in total or in part, please state the complete facts upon which you base your denial." Kaven answered, "For Admissions 1 and 2, see Exhibit "A" as

The trial court ultimately found that as of December 2008 the businesses were worth in excess of $380,000. In the trial court's view, Kathie had proven the matter which Kaven was asked to admit, and she was thus entitled to recover pursuant to CR 37.03, "the reasonable expenses incurred in making that proof." The trial court further held that virtually all of Kathie's approximately $50,000 in attorneys' fees were devoted to the business valuation issue. We agree with Kaven, however, that the value of the businesses was a matter of legitimate dispute, and that he could, without running afoul of CR 36.01, deny that the agreement with Alioto established a market-value floor.

To begin with Kathie's first request—that Kaven admit to a $132,500 purchase of Alioto's 50% interest in the businesses—it is obvious that Kaven's denial was not improper given that the face value of the agreement was $122,500, not $132,500. Kaven did not deny the existence of the agreement or that the agreement said what it said; he only denied, with good reason it appears, that it said what Kathie said it said.

For the same reason—the inaccuracy of Kathie's request—Kaven could also legitimately deny that in December 2008 the businesses were worth at least $265,000. Even if the deal with Alioto were thought to reflect the market value of the businesses, the guaranteed value reflected in the deal was only $245,000, and thus the

Alioto agreement could not be the basis for requiring Kaven to admit to a higher value.

■ More fundamentally, Kaven could legitimately deny that the price he paid to dissolve his problematic business relationship with Alioto established a floor for the businesses' fair market value. The transaction with Alioto was not an ordinary market transaction between a disinterested buyer and a disinterested seller, and Kaven could justifiably contend, therefore, that an independent appraisal of the businesses might well conclude (as his expert appraisal ultimately did conclude) that the market value was less than twice the price he paid to the other 50% owner. Civil Rules 36 and 37 give parties a means of identifying relevant matters of fact about which there is no genuine dispute to be tried; they are not meant to address matters of legitimate dispute that must be tried. Because Kaven had reasonable grounds to believe that he might prevail on the business-valuation matter, his denial of Kathie's requests for admission was not improper and should not have subjected him to an attorney fee sanction under CR 37.03.

We thus agree with Kaven that the trial court abused its discretion by imposing a $50,000 discovery sanction under the circumstances of this case. Kaven is not necessarily entitled to relief, however, for while a discovery sanction was not appro-

---

to denial." The Exhibit "A" attached to his responses is a copy of the agreement with Alioto. Kathie's request for production of documents asked, among other things, "With respect to Advantage Associates, Inc. and Highview Manor Associates LLC, please produce ... All appraisals of real estate owned by either entity, including appraisal done in connection with PBI (Central Bank loan)." Kaven responded in part by referring to Exhibit "F." Exhibit "F" appears to be a December 2008 appraisal letter from the Bryant

Appraisal Company to an officer of the PBI Bank estimating the value of Highview Manor, the business realty, to be $1.87 million. Both parties have referred us to this letter in conjunction with Kaven's denial of Kathie's requests for admission regarding the Alioto agreement. We acknowledge the references, but in our view the Bryant appraisal letter, which Kaven did not offer as a basis for his denials, has no bearing on the question before us.

priate, the trial court's fee award also invoked KRS 403.220, and the Court of Appeals panel ruled that regardless of CR 37.03, the fee award was appropriate and could be affirmed under the statute. We agree with the Court of Appeals that the record would support a fee award pursuant to KRS 403.220, but the trial court, we believe, should be allowed to apply the statute in the first instance.

## II. KRS 403.220 Would Permit an Award of Attorney's Fees.

 As another exception to our American Rule against the shifting of attorney's fees, KRS 403.220 provides in pertinent part that in any proceeding under Chapter 403 (the marriage dissolution and child custody chapter),

> [t]he court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending [the] proceeding ... and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

Under this statute, we have held, a trial court is authorized "to order one party to a divorce action to pay a 'reasonable amount' for the attorney's fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor." *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 519 (Ky.2001) (*citing Sullivan v. Levin*, 555 S.W.2d 261, 263 (Ky.1977), *overruled on other grounds, Hale v. Hale*, 772 S.W.2d 628 (Ky.1989)). Disparate resources, not need *per se*, is all that is required to invoke the statute, *Gentry v. Gentry*, 798 S.W.2d 928, 937 (Ky. 1990), but in applying it, in addition to the parties' financial resources,

the trial court should consider other relevant factors including ... (a) Amount and character of services rendered. (b) Labor, time, and trouble involved. (c) Nature and importance of the litigation or business in which the services were rendered. (d) Responsibility imposed. (e) The amount of money or the value of property affected by the controversy, or involved in the employment. (f) Skill and experience called for in the performance of the services. (g) The professional character and standing of the attorneys. (h) The results secured. Additionally, "obstructive tactics and conduct, which multiplied the record and the proceedings" are proper considerations "justifying both the fact and the amount of the award."

*Sexton v. Sexton*, 125 S.W.3d 258, 272–73 (Ky.2004) (*quoting Gentry*, 798 S.W.2d at 938; other citation and internal quotation marks omitted). The purpose of the fee-shifting statute, we have noted, is simply to ensure the fairness of domestic relations proceedings: "to prevent one party to a divorce action from controlling the outcome solely because he or she is in a position of financial superiority," *Neidlinger*, 52 S.W.3d at 521, and "to equalize the status of the parties to a dissolution proceeding ... in an effort to eliminate the inequities resulting from the termination of the relationship." *Sullivan*, 555 S.W.2d at 263. To that end, if the parties' resources are disparate, the trial court enjoys a broad discretion under the statute to allocate costs and award fees, *Wilhoit v. Wilhoit*, 521 S.W.2d 512, 514 (Ky.1975), including "wide latitude to sanction or discourage" "conduct and tactics which waste the court's and attorneys' time." *Gentry*, 798 S.W.2d at 938.

Given that broad discretion, the Court in *Gentry* upheld an $100,000 attorney's fee award where the financially superior party had grossly inflated the costs of the di-

vorce proceeding by obscuring his true net worth within a maze of hidden assets and bogus liabilities. Because much of the litigation's expense "could have been avoided by candor and cooperation," the Court held, there was "no abuse of discretion nor any inequity in requiring the party whose conduct caused the unnecessary expense to pay it." 798 S.W.2d at 938. The Court bolstered this conclusion to its discussion of KRS 403.220 by adding, without discussion, a reference to CR 37.01, which then (*Gentry* was decided in 1990), as now, provided that a party successfully moving to compel certain forms of discovery might also be awarded the expenses, including attorney's fees, "incurred in obtaining the order." There is no suggestion in the opinion that CR 37.01 had been invoked or applied in the trial court. The Court's reference to the rule, rather, seems to have been intended merely to underscore the propriety of the trial court's KRS 403.220 fee award by noting that for some portion of it, at least, there may well have been an alternative ground.

The *Gentry* Court's recognition that litigation conduct unduly increasing the cost of a domestic relations proceeding is a factor the trial court should consider when applying KRS 403.220, whether that conduct violates a rule or not, was reiterated in both *Neidlinger* and *Sexton*. In this respect, *Gentry*, *Neidlinger*, and *Sexton* are all contrary to *Cochran v. Cochran*, 746 S.W.2d 568 (Ky.App.1988), in which,

two years prior to *Gentry*, a panel of the Court of Appeals held that obstructive litigation conduct was not a factor to be considered under KRS 403.220, but could only be addressed pursuant to a motion under CR 37.[5] As noted, we have repudiated that notion, and to that extent, *Cochran* is no longer reflective of Kentucky law.[6]

Nevertheless, Kaven relies on *Cochran* to insist that KRS 403.220 was not intended to be punitive and should not be employed as a sanctioning device for allegedly obstructive litigation practices. Rather, according to Kaven, a divorcing party requesting fees, and a trial court awarding them, must take exacting care to distinguish fees meant to promote financial parity from fees meant to recoup litigation expenses necessitated by improper conduct and address them separately under KRS 403.220 and CR 37, respectively.

■ To a very limited extent we agree. We agree that the fee shifting authorized under KRS 403.220 is not intended primarily to be punitive or sanctioning. It is intended, as noted above, to ensure that dissolution and child-custody proceedings are fair and not skewed in favor of the party in the financially superior position. We do not agree, however, that that fact entails the procedural niceties Kaven would have us impose.

that the litigation in that case had been unduly obstructed, KRS 403.220 could not, in that case, be the vehicle for addressing the obstruction, because the parties' resources were equal, not disparate, and so the statute did not apply. Remanding in those circumstances for reconsideration under CR 37, the Court recognized, implicitly, as the *Cochran* panel did not, that the statute and the rule are potentially overlapping, and were not intended to be mutually exclusive.

**5.** Neither *Gentry* nor *Neidlinger* cites *Cochran*, and *Sexton*, although noting *Cochran's* inconsistency with *Gentry*, stopped short of recognizing that, at least to the extent of the inconsistency, it had thus been overruled.

**6.** The *Cochran* panel purported to rely on *Lampton v. Lampton*, 721 S.W.2d 736 (Ky. App.1986), another case to which Kaven refers us, but *Lampton* did not hold that litigation conduct had no bearing on a KRS 403.220 fee award. It held, rather, that, notwithstanding the trial court's evident concern

We are persuaded, rather, as we held in *Gentry*, that with KRS 403.220 the General Assembly recognized that domestic relations proceedings—proceedings often charged with bitter contentiousness—frequently pit parties with grossly unequal financial resources against one another. Such proceedings are particularly susceptible to domineering tactics and manipulation by the side with the deeper pockets. The forms that such tactics might take are myriad, of course, and many of them are perfectly legitimate. Litigation, after all, is a highly competitive undertaking. The General Assembly was concerned, however, not so much with policing dissolution and child-custody proceedings, as it was with insuring that whatever the wealthier party's tactics, the financially less fortunate party will have the ability to make an adequate response. In other words, the financially superior party in a KRS Chapter 403 proceeding is free to play hardball, but that party does so at the risk of being obliged to pay for the other side's designated hitter. In assessing whether and to what extent the financially less fortunate party's fees should be shifted, the trial court need not, therefore, engage in nice distinctions between legitimate trial tactics and illegitimate ones. As we held in *Gentry*, a financially superior party's having upped the cost of the litigation by straining facts or by skirting the rules is certainly a factor the trial court may consider, but the main concern is not to sanction litigation misconduct. Rather, the main concern is simply to ensure that the proceedings do not impose an unreasonable or an unfair burden on the party with fewer financial resources. To prevent that result, the trial court enjoys a broad discretion in shifting fees.

 Recognizing that discretion, the Court of Appeals ruled that the attorney fee award could be upheld in this case under KRS 403.220, regardless of the fact that the trial court expressly premised the award, at least in part, on what it found was a violation of CR 36.01. Generally, of course, an appellate court may affirm a judgment on a ground other than that relied on by the trial court, provided that the alternative ground is supported by the record. *Dick's Sporting Goods, Inc. v. Webb*, 413 S.W.3d 891 (Ky.2013) (*citing Emberton v. GMRI, Inc.*, 299 S.W.3d 565 (Ky.2009)). Without faulting the Court of Appeals, however, we decline that route in this case, lest in our effort to affirm the trial court's discretion we instead usurp it. Rather than adopting KRS 403.220 as an alternative ground for affirmance, (which would require us in effect to find in the first instance that the parties' resources are disparate and that fairness to Kathie requires the shifting of $50,000 worth of her attorneys' fees) we think it better to remand the matter and to allow the trial court to make those findings, should it so decide, for itself.

### III. A Post–Judgment CR 59.05 Motion is Not Available For the Assertion of Claims That Could Have Been Asserted Prior to Judgment.

 Finally, Kaven contends that the trial court abused its discretion under CR 59.05 when, after trial and the initial entry of judgment, it amended its findings and its award of marital property to Kathie to reflect what the court found was an increase in the value of Advantage prior to trial but subsequent to the appraisals by the parties' experts. As Kaven correctly notes, while CR 59.05 accords the trial court broad discretion to "alter or amend a judgment," so as to correct manifest errors, to address intervening changes in controlling law, to take into account newly discovered but previously unavailable evidence, or otherwise to prevent manifest injustice, a party cannot invoke CR 59.05

"to raise arguments and to introduce evidence that should have been presented during the proceedings before the entry of judgment." *Gullion v. Gullion,* 163 S.W.3d 888, 893 (Ky.2005) (*citing Hopkins v. Ratliff,* 957 S.W.2d 300 (Ky.App.1997)). We agree with Kaven that Kathie invoked the rule to raise matters she could and should have raised "during the proceedings."

At trial, both sides agreed to use December 2008 as the date for valuing both the business realty and Advantage's bingo/snack-bar business. The record reflects that 2008 was the last year for which financial records were available. Kaven testified, indeed, that even as of the October 2010 trial date, the businesses' 2009 tax returns had not been filed. In valuing Advantage, Kathie's experts included what they opined was Advantage's equity in the business realty. As of December 2008, that equity was, according to Kathie's experts, the difference between what was then the value of the realty—about $1.4 million in their view—and Advantage's then existing outstanding loans not attributable to operating expenses—about $1.37 million—or roughly $30,000. Advantage's long-term debt included, but was not limited to the mortgage on the business realty.

At trial Kathie introduced the mortgagee bank's "loan activity statement" regarding the mortgage debt, and that statement reflects that as of September 24, 2010, just a month before trial, the mortgage principal had been reduced to about $1,226 million. Arguing from that figure that the equity in the realty had increased by about $175,000 during the pendency of the action—the difference between the total long-term debt of about $1.40 million[7] and the mortgage debt of about $1,225 million—Kathie moved pursuant to CR 59.05 to have the judgment amended to reflect an $175,000 increase in the amount of marital property, and a concomitant increase in her share of that property of about $87,500.

The first major flaw in Kathie's position is timing. Her CR 59.05 motion was premised on information contained in trial exhibits and thus the alleged increase in marital property could easily have been raised, indeed had to be raised, prior to judgment. Moreover, to propose, in a post-trial motion, deviating from the December 2008 business valuation date based on one factor regarding the mortgage debt was not only procedurally improper, it also was substantively improper. Kathie's argument hinges on incorrectly equating the total long-term debt and the mortgage debt, as well as on other unsubstantiated assumptions. The long-term debt figure employed by all of the experts included debts other than the mortgage debt. According to the "loan activity statement" Kathie herself introduced, the mortgage debt as of December 2008 was not $1.4 million (that was the total long-term debt), but rather was about $1.3 million. The post-appraisal, pre-trial mortgage debt reduction, then, was more in the neighborhood of $75,000 than $175,000. To attribute even that $75,000 to Advantage's equity, moreover, one must assume that while the mortgage debt was being reduced the business's other long-term debts did not increase and the value of the realty did not decrease. There is no basis in the record (no pertinent testimony by Kathie's experts, for example) for making those assumptions and, if there were, Kaven still would be entitled to an opportunity to respond.

7. For this calculation Kathie preferred Kaven's expert's $1.40 million estimate of the long-term debt to her own expert's $1.37 million estimate.

The trial court appears to have accepted Kathie's post-trial argument because during the pendency of the action Kaven "had complete control of the financial information" and "was solely responsible for the filing of tax returns and providing updated financial records," *i.e.*, Kaven's seemingly dilatory tactics justified "updating" the valuation. In other words, the trial court used CR 59.05 to assess an additional $87,500 discovery sanction against Kaven. This was an abuse of discretion. *Cf. Bell*, 423 S.W.3d at 749 (holding that attorney's fees are appropriate as a sanction "not for the benefit of the individual plaintiff," but only "to support the integrity of the court"). We express no opinion as to the propriety of a sanction had the question been properly raised—had an order compelling updated discovery been granted and defied, for example. We are persuaded, however, that if Kathie wished to pursue a claim that Advantage's value increased during the pendency of the action, or wished to assert that Kaven's recalcitrance had thwarted her pursuit of such a claim, she could and should have raised the matter during prejudgment proceedings, in accordance with the civil rules, while Kaven still had the opportunity to gather and present evidence in response. Her belated resort to CR 59.05 was improper, and the trial court's countenancing of that resort was an abuse of discretion entitling Kaven to relief.

## CONCLUSION

In sum, our civil rules envision litigation that is hard fought but fair. In applying and enforcing the rules, a trial court has the difficult task of allowing the contest while disallowing abusive or otherwise improper tactics. The necessary balance between fairness and fight will not always be apparent, but in this case, in our view, the trial court tipped the wrong way twice. By imposing attorneys' fees on Kaven for refusing to admit a matter he could justifiably dispute, the trial court read into CR 37.03 more of a departure from the American Rule of not shifting fees and more of a restraint on Kaven's right to litigate than the rule intends. By permitting Kathie to assert more than a quarter of her claim to marital property via the back door of CR 59.05, on the other hand, the trial court approved a tactic at odds with the basic notion that a fair proceeding includes notice and an opportunity to be heard. Accordingly, we reverse that portion of the trial court's amended Judgment increasing Kathie's award of marital property. Kathie's award of attorneys' fees, however, we do not reverse, we merely vacate. We do so in light of KRS 403.220, through which the General Assembly has provided that in proceedings between parties of disparate means under KRS Chapter 403, fairness to the financially weaker party is to be assured by means of fee shifting, if necessary in the court's discretion. Although Kathie is not entitled to attorneys' fees as a discovery sanction, she may well be entitled to them under the statute. We leave that determination for the trial court to make anew, without regard to CR 37.03, on remand. Accordingly, we hereby reverse the Opinion of the Court of Appeals to the extent that it upheld Kathie's increased marital property award and her award of attorneys' fees. We remand the matter to the trial court for reconsideration of Kathie's right to attorneys' fees under KRS 403.220 and for reinstatement of the original award regarding marital property.

All sitting. All concur.