RENDERED: NOVEMBER 15, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0032-MR

ROBERT E. SMITH AND
ANDRONIA SMITH                                          APPELLANTS

v.        APPEAL FROM HENDERSON CIRCUIT COURT
          HONORABLE KAREN LYNN WILSON, JUDGE
          ACTION NO. 22-CI-00208

LOIS B. HARPER AND
MARK O. BIGGS                                           APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CETRULO, AND A. JONES, JUDGES.

CETRULO, JUDGE: Appellants Robert E. Smith ("Robert") and Andronia Smith

("Ann") appeal an Order and Judgment of the Henderson Circuit Court entering a

jury verdict in favor of their landlord for breach of contract, unjust enrichment, and

self-help eviction, and for their landlord's representative on a claim of tortious

interference with a contract. After review, we affirm.

# BACKGROUND

Appellee Lois B. Harper ("Harper") owned 1424 Adams Lane in Henderson, Kentucky ("Property"). On April 29, 2021, Harper entered into a contract ("April Contract") to sell her Property to Robert and Ann (together, the "Smiths") for $289,000. As part of the April Contract, the Smiths agreed to pay Harper $2,000 in earnest money, and Harper agreed to deliver clear title. The April Contract stated that closing would take place "by May 29, 2021 if possible or within thirty (45) [*sic*] days from the date hereof[.]" The closing did not occur as contracted.

On July 11, 2021, Harper and the Smiths entered into another contract to sell/purchase the Property ("July Contract"). This July Contract set the purchase price at $282,700; acknowledged that Harper received a $2,000 deposit; and again required Harper to deliver clear title. The "Closing" section of the July Contract stated, "[t]his transaction shall close within 45 days of the date of this agreement. This agreement may be extended, but must be done in writing signed by all parties hereto." The July Contract was also "fully contingent on the [Smiths] obtaining proper financing to purchase the [Property] at the agreed amount of $282,700."

In order for the Smiths to take immediate occupancy of the Property, Ann and Harper signed a rental contract with a narrow timeframe ("Limited Rental Agreement") on July 17, 2021. This Limited Rental Agreement specifically

allowed the Smiths to rent the Property "until [their] latest closing date of 8/31/21." The Limited Rental Agreement allowed the Smiths to move into the Property immediately, put utilities into their names, take over homeowners' insurance, and "maintain the [Property] as if it is already [their] own[.]" The Limited Rental Agreement set rent for the last two weeks of July at $600 and the month of August at $1,200. The Limited Rental Agreement did not account for rent beyond August 31. On or about July 17, Ann paid Harper with a check for the prorated July rent and homeowners' insurance, but that check was returned for insufficient funds.

Again, the closing did not happen by August 25, *i.e.*, within 45 days of the signing of the July Contract. The parties orally agreed to a month-to-month rental contract on the Property until the home sale closed. Sometime in early September, the Smiths paid that month's rent by check, but again that check was returned for insufficient funds. Relations between Harper and the Smiths fell apart, as did Harper's health. On September 30, 2021, Appellee Mark O. Biggs ("Biggs") texted the Smiths and instructed them to have no further contact with Harper. Biggs was unknown to the Smiths prior to that text, and they did not have prior knowledge of his connection with Harper.

On or about October 5, Harper served the Smiths with a Notice to Quit (an undated document). The Notice to Quit stated that the July Contract had

-3-

expired; the Smiths had failed to secure financing for the Property; and they had failed to pay rent for September. As a result, the Notice to Quit stated that Harper was electing not to extend the July Contract and gave the Smiths seven days to vacate the Property. That same day, Ann deposited approximately 2 months of rent directly into Harper's mortgage account, but did not inform Harper of the payment at that time.

On October 8, Biggs drove to the Property with Harper to encourage the Smiths to vacate. Harper stayed in the vehicle while Biggs entered the Property without the Smiths' permission, removed the back entry door from its hinges, and removed a garage door keypad from the structure of the house. Then, Harper, Biggs, and the Smiths had a conversation in the Property's front yard. Harper believed she had not received September rent as of that time. However, the Smiths informed Harper that – although payment was late – they had recently deposited their past due rent directly into her mortgage account. The Smiths allege that this front yard meeting ended with an oral agreement to proceed with the home purchasing process, as evidenced by a letter received the next week.

Around October 12, the Smiths received a Notice of Termination by Landlord ("Extension Letter"). The Extension Letter is nearly illegible in parts, but appears to state that "[a]s per our agreement at our in-person meeting on 8 October 2021, you will have your financial institution (Old National Bank)

confirm a closing date with [Biggs], Counsel for Landlord,[1] in a conference call no later than 15 October 2021 at 12:00 CST." Somewhat confusingly, the Extension Letter also stated that it "serves as notification of the Landlord's intention to terminate your Contract." Also adding to the confusion, the Extension Letter stated that if the Smiths' bank did not confirm financing as directed by October 15, the lease would be effectively terminated, and the Smiths should vacate the Property by noon that day (October 15). Harper signed this Extension Letter, and her signature was notarized. The Smiths did not sign the Extension Letter.

The parties have differing accounts regarding the events leading up to the Smiths' failed financing – to be discussed in more detail below – but as of October 15, the Smiths did not have financing for the Property and Harper retained counsel to proceed with a forcible detainer action against the Smiths. Harper evicted the Smiths in November 2021.

On April 21, 2022, the Smiths filed a complaint in Henderson Circuit Court against Harper for breach of contract, unjust enrichment, ouster/self-help eviction, and against Biggs for tortious interference with a contract. Simultaneously, the Smiths filed a *lis pendens* notice on the Property. The Smiths

---

[1] Biggs held himself out to be Harper's attorney, but he is not a licensed attorney; he merely held Harper's power of attorney.

-5-

sought reimbursement for their $2,000 earnest money and for repair/improvement work they paid to have done on the Property while living there. With their complaint, the Smiths included invoices for repair/improvement work they paid to have done on the Property totaling $10,715.50 (the "invoices"). Harper counter-claimed for negligence (due to the Smiths negligently maintaining the Property so as to cause "substantial damage" to the Property), and slander of title (due to the *lis pendens*).

Upon request during discovery, the Smiths tendered bank records reflecting payments in the amount of the invoices. Under oath, the Smiths testified as to the validity of those invoices and bank statements, but counsel for Harper discovered that the Smiths falsified the tendered bank records. The court sanctioned the Smiths in the sum of $9,515.50. Litigation proceeded and in November 2023, the circuit court held a two-day jury trial.

At trial, all the parties testified, as did a former employee of the financial institution from which the Smiths attempted to get a loan ("Loan Officer"), an employee from a business that did work for the Smiths at the Property, a handyman employed by Harper who worked on the Property after the Smiths vacated the residence, and a banker at Robert's bank.[2] Not all are relevant to this appeal.

---

[2] The trial court allowed Harper's counsel to read her deposition into the record.

Ann testified that the parties could not close pursuant to the April Contract because Harper could not provide clear title, not because the Smiths failed to attain financing. She testified that the parties could not close according to the July Contract and/or Extension Letter because the lender "retracted" their loan application on October 14 – one day before financing was due – after Biggs called the bank and informed it that Harper no longer wished to sell the Property to the Smiths and the purchase agreement had lapsed. Ann admitted that they (the Smiths) falsified the bank records because they paid the invoices in cash but thought they would not be believed without a paper record of those payments.

On cross, Ann could not explain how two of the invoices were nearly identical in appearance despite coming from different companies; nor could Ann explain why at depositions she stated that she had no familial relationship with any of the members of the companies supplying the invoices. However, at trial she admitted that one invoice came from a company associated with her ex-husband, and another invoice came from a company operated by her son.

The Loan Officer testified next, but she could not remember details from the Smiths' loan application nor any specific conversations she had with the parties. She testified she no longer worked for the bank, had not recently reviewed any bank records specific to the Smiths, and did not think she should or could speak on behalf of the bank. She did not know why the closing on the Property

failed to occur or why the Smiths were or were not approved for a loan. Additionally, Harper entered a "notice of incomplete application" letter from the Smiths' bank that stated as of September 6, 2021, the Smiths' loan application was deficient.

Biggs testified and admitted he took the door off the hinges and removed the garage door key pad from the Property on October 8. He admitted there were liens on the Property, but the last lien was cleared between October 8 and 11. He admitted to calling the Smiths' bank to inquire about their financing for the Property, but stated he did not block or cancel the Smiths' lending application.

At the close of evidence, both parties moved for directed verdicts on all issues. The court granted the Smiths' motion for a directed verdict with respect to the slander of title claim because the Smiths were permitted to file a *lis pendens* when they filed that action. The court denied the motions for directed verdict on the remaining claims. The jury found in favor of Harper and Biggs on breach of contract, unjust enrichment, and ouster/self-help eviction claims, but did not award any punitive damages. As the jury found for Harper on the breach of contract claim, it did not address the tortious interference with a contract claim against Biggs. The Smiths appealed.

## ANALYSIS

As a preliminary matter, we note the numerous errors and deficiencies within the Smiths' appellate briefs, including numerous statements of law without legal citation, copious statements presented as "fact" that were not established at trial, and the lack of reference to the record for the "facts" that *were* established at trial. Citations are for the appellant to provide, not for the court to supply. *See* Kentucky Rule of Appellate Procedure ("RAP") 32(A)(4) (requiring arguments to have "ample references to the specific location in the record and citations of authority pertinent to each issue of law"). Moreover, it is not the job of the appellate courts to scour the record for support of an appellant's argument. *See Smith v. Smith*, 235 S.W.3d 1, 5 (Ky. App. 2006) (We do not "search the record to find where it may provide support for [a party's] contentions."). Despite these defects, we shall proceed to the merits of the matter in order to provide finality to the parties.

On appeal, the Smiths argue[3] (A) the trial court erred in allowing the jury to determine whether a valid contract existed via Jury Instruction No. 2, and

---

[3] The Smiths also argue that the trial court erred by denying them an opportunity to impeach Harper through an audio recording "in accordance with the Kentucky Rules of Evidence." As will become a common theme in this analysis, the Smiths do not cite *what rule* within the voluminous Kentucky Rules of Evidence supports their argument, nor do they cite *any caselaw* showing that the trial court's failure to admit such evidence was error. After a review of the record, it is clear that this claim is without merit, but we will not discuss it further. "We will not search the record to construct [the appellant's] argument for him, nor will we go on a fishing

-9-

this improper ruling resulted in a mishandling of the tortious interference with a contract claim under Jury Instruction No. 8; (B) the trial court erred by failing to grant Smiths' motion for a directed verdict on the ouster/self-help eviction; and (C) the amount of the sanction against the Smiths is improper.  We will address each argument in turn.

### A. Jury Instructions

"Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review." *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky. App. 2006).

Jury Instruction No. 2 was for the breach of a contract claim.  The first element of this claim required the jury to find for the Smiths if they believed a valid contract existed between the Smiths and Harper on or after September 1, 2021.  Focusing on this element alone, the Smiths argue the trial court should have informed the jury that a valid contract existed as of September 1, and only elements 2 to 4 should have been left to the jury to decide (for the breach of contract claim).  Essentially, the Smiths contend that the trial court should have found as *a matter of law*, the existence of a valid, enforceable contract, and not left this to the jury to determine as *a finding of fact*.  Conversely, Harper argues that

---

expedition to find support for his underdeveloped arguments." *Prescott v. Commonwealth*, 572 S.W.3d 913, 923 (Ky. App. 2019) (citation omitted).

the existence of a contract is a *question of fact* to be determined by a jury and hence, Jury Instruction No. 2 was proper. Neither argument is universally inaccurate, but the parties are asking the wrong question.

Kentucky courts have considered the *existence* of a contract to be both a question of law and a question of fact, depending on the circumstances. *See Hickey v. Glass*, 149 S.W.2d 535, 536 (Ky. 1941) ("The question of fact is, whether or not such a contract was made[.]"); *see also Britt v. Univ. of Louisville*, 628 S.W.3d 1, 5 (Ky. 2021) (citation omitted) ("[I]ssues regarding the formation and construction of a contract are questions of law."). However, here, despite the verbiage used in the first element of Jury Instruction No. 2, we do *not* have a legal question regarding the *existence* of a contract.

The first element in Jury Instruction No. 2 requires the jury to determine if a "valid contract existed between [the Smiths] and [Harper] on or after September 1, 2021[.]" The trial court did not err in phrasing the element in this manner. A trial court is required to use a "bare bones" approach to jury instructions and provide the bare minimum of instruction. *See Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 723 (Ky. 2020).[4] This first element, as

---

[4] Finding Kentucky "trial courts are called upon to engage in a balancing effort to ensure that jury instructions in Kentucky provide only the bare minimum necessary to ensure that the jury understands the ultimate issue of fact to be decided in any case, but still provide enough law and background knowledge so that the jury comes to a decision that is supported by law." *Id.*

phrased, asks the jury for the *proper finding*, *i.e.*, asks the jury for the answer the court needed. In legally specific terms, that element really asked the jury to determine whether the parties *intended to extend the July Contract* (after September 1) as evidenced by the Notice to Quit, Extension Letter, and/or testimony of oral agreements.

The Smiths and Harper agree that the July Contract was a valid, enforceable contract. A contract *existed*. That contract is not ambiguous; it sets closing within 45 days, and the contract "may be extended . . . in writing [if] signed by all the parties[.]" Typically, if a contract is not ambiguous, a court must interpret it according to "its ordinary meaning and without resort to extrinsic evidence." *See Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (citing *Wehr Constructors, Inc. v. Assurance Co. of America*, 384 S.W.3d 680, 687 (Ky. 2012) (internal quotation marks omitted)). Here, despite the July Contract not being ambiguous, extrinsic evidence (Notice to Quit and Extension Letter) was properly reviewed by the trial court, because the non-ambiguous July Contract *explicitly permitted extension* and the Notice to Quit and Extension Letter were these possible "extensions." Stated another way, as the July Contract explicitly permitted contract extension – and the contract must be interpreted according to its

-12-

clear language – the trial court properly permitted consideration of possible contract extensions.

Nonetheless, the Notice to Quit and Extension Letter do *not* have that same clarity as the July Contract. The undated Notice to Quit confusingly states that the Smiths had not paid rent as of September 30 but also stated the Smiths needed to vacate within seven days, by September 8. Hence, the Notice to Quit is *ambiguous* because it states rent had not been paid as of September 30 but then implies the letter itself was sent on September 1. Similarly, the Extension Letter is *ambiguous*; almost one-third of the contract is nearly illegible due to (presumably) a printing error. More importantly, the Extension Letter implies *immediate* termination of any agreement between the Smiths and Harper, but then also appears to make termination conditional until *October 15*. "[D]etermining whether a contract is ambiguous[] is a question of law for the courts[.]" *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002) (citations omitted). "However, once a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." *Id.* (citations omitted). Thus, as the Notice to Quit and Extension Letter were ambiguous, they – and the extrinsic evidence related to them – became factual issues to be resolved by the fact-finders, *i.e.*, the jury.

-13-

It is not our role as an appellate court to be fact-finders or to judge the credibility of the witnesses; rather, "[t]he credibility of the witnesses and the weight to be given to their evidence [is] for the jury." *Cochran v. Downing*, 247 S.W.2d 228, 229-30 (Ky. 1952). Here, testimony varied as to what the parties intended, if they intended a contract extension, what conversations were had, and how important timing was in the home sale process. These questions of fact and credibility are for the jury to decide. *See id.* Therefore, the trial court did not err in requiring the jury to determine if a contract existed on or after September 1, because that was a simple, clear way of asking the jury to fact-find areas of dispute. As such, the trial court properly sent the first element of Jury Instruction No. 2 to the jury.

Next, the Smiths argue the trial court improperly instructed the jury to skip Jury Instruction No. 8 (the tortious interference of a contract claim) if they found for Harper on the Jury Instruction No. 2 (the breach of contract claim). As the jury found for Harper on No. 2, we have no decision from the jury on No. 8. The Smiths argue this was improper for two reasons. First, as discussed above, the Smiths contend the trial court should not have asked the jury to consider if a contract existed on or after September 1. As we have held such an instruction was not improper, we continue to their second reason.

Second, the Smiths argue that the tortious interference of a contract claim is not entirely dependent upon a finding of breach of contract; the Smiths assert the jury could have found that the Smiths did not establish all the elements of breach of contract, but still could have found Biggs tortiously interfered with the contract. We disagree.

Here, Jury Instruction No. 2 required the jury to find proof of four elements – existence of a contract, Smiths' performance, Harper's failure to perform, and Smiths' resulting economic loss – in order to find for the Smiths. As the jury foreperson only placed a checkmark next to "We find for the defendant, [] Harper, on the plaintiffs' claim for breach of contract[,]" we do not know which of the four elements the jury determined the Smiths did not prove, but the jury's verdict signifies a lack of contractual rights. Generally, under Kentucky law, tortious interference liability is predicated upon an intentional interference, malicious or without justification, *with known contractual rights* possessed by the party suing to recover damages. *Seeger Enterprises, Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791 (Ky. App. 2017).[5] Here, the jury's verdict on Jury Instruction No. 2 concluded that the Smiths had *no contractual rights*. In *Seeger*,

---

[5] More specifically, to show tortious interference with a contract, the Smiths needed to show: (1) the existence of a contract; (2) Biggs' knowledge of the contract; (3) that Biggs intended to cause a breach of that contract; (4) that Biggs' actions did indeed cause a breach; (5) that damages resulted to the Smiths; and (6) that Biggs had no privilege or justification to excuse its conduct. *See Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. App. 2012).

our Court upheld a directed verdict against a party claiming tortious interference where the party failed to present evidence that it had a valid contract. *Id*. at 795. Similarly, we have also upheld a summary judgment denying tortious interference with a contract where the elements were not met. *See Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. App. 2012). Here, the trial court permitted the Smiths to present the breach of a contract claim to the jury, but they were unable to prove this claim nor establish their contractual rights, rights that are required to establish a tortious interference with a contract claim.

Moreover, after the jury found for Harper on the breach of contract claim, it would have been inconsistent to permit the jury to proceed to Jury Instruction No. 8, because it was apparent that the Smiths could not satisfy the elements of their tortious interference claim: *no evidence* was presented that Biggs caused the Smiths to breach; *no evidence* was presented that the Smiths received loan approval; *no testimony* from the Loan Officer confirmed that the Smiths acquired loan approval nor that Biggs interfered with the Smiths' loan application; *no admission* from Biggs was obtained that he affected the Smiths' loan. In fact, the evidence at trial showed the Smiths had not submitted all the information necessary to be approved for a loan. If they had not submitted the information to receive a loan, the jury could not have determined that Biggs' actions caused the Smiths to breach (*i.e.*, caused the Smiths' loan approval to be canceled). We find

-16-

no error in instructing the jury to skip the tortious interference instruction in light of their previous verdict on Jury Instruction No. 2 and based upon the evidence of record.

### B. Self-Help Eviction

The trial court denied the Smiths' motion for a directed verdict on the self-help eviction claim and left it to the jury to decide. Eleven jurors found for Harper (and Biggs) and determined the Smiths did not establish this claim. On appeal, the Smiths argue that the trial court erred by denying their motion because there was no other reasonable inference from the facts, but we do not agree.

> A motion for directed verdict "raises only questions of law as to whether there is *any* evidence to support a verdict." *Harris v. Cozatt, Inc.*, 427 S.W.2d 574, 575 (Ky. 1968) (emphasis added). As such, if there is any "conflicting evidence, it is the responsibility of the jury, the trier of fact, to resolve such conflicts." *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 215 (Ky. App. 2009). It is not the trial court's role to consider the credibility or weight of the proffered evidence. "[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998) (internal quotation marks and citation omitted). This is a high burden to meet.

*Louisville Metro Gov't v. Ward*, 610 S.W.3d 295, 307 (Ky. App. 2020).

"On appellate review, we will reverse the trial court's ruling only if we find that the jury could not have reasonably reached its verdict on the basis of

-17-

the evidence before it." *Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 530 (Ky. 2022) (internal quotation marks and citation omitted).  Only where the jury's result is "palpably or flagrantly against the evidence" may we reverse the trial court's decision to deny a motion for a directed verdict.  *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459, 461 (Ky. 1990) (internal quotation marks and citation omitted).

Here, the Smiths direct us to the jury instructions, but do not point us to where in the record the trial court denied their motion for a directed verdict. Neither do they provide us with support in the record that they proved the elements of the claim.  Again, we do not review whether the elements of the *jury instructions* have been met; we must look at the elements of the claim, *i.e.*, the statutes and case law creating the cause of action.  *Belt*, 664 S.W.3d at 530.

The Smiths simply argue the trial court erred by denying their motion for a directed verdict on the self-help eviction claim because "there was no evidence or basis to support a finding other than one that an ouster or self-help eviction occurred in this case."  The Smiths argue that Biggs admitted during his testimony that he *attempted* to ouster the Smiths from the Property on October 8 when he entered the home without permission, removed the back door, and damaged the garage keypad.  They argue, *without citation*, that the *attempt* to ouster is sufficient to warrant a directed verdict on this claim.

-18-

Conversely, Harper and Biggs claim that in order to recover damages for a self-help eviction, there must have been more than an *attempt*, but an actual improper "ouster." They claim that the Smiths cannot succeed on a self-help eviction claim (based on Biggs' actions on October 8), because the Smiths were not removed/evicted/forced out from the Property on that day and/or as a result of Biggs' actions.

If a landlord wants an unwilling tenant to leave, there is a legal remedy provided by our forcible entry and detainer statutes. Kentucky Revised Statutes ("KRS") 383.200 *et seq*. This is the exclusive remedy. *Hoskins v. Morgan*, 61 S.W.2d 30 (Ky. 1933). Citing *Hoskins*, the encyclopedia known as American Jurisprudence explains self-help, including private entry and personal force, are not permitted. 35A AM. JUR. 2D *Forcible Entry and Detainer* § 8 (2023). In fact, a landlord may be held liable for damages sustained because of a self-help physical eviction, even if the damages are humiliation alone. *Maddix v. Gammon*, 169 S.W.2d 594 (Ky. 1943). Evictions can be actual, *i.e.*, "[a] physical expulsion of a person from land or rental property." *Eviction*, BLACK'S LAW DICTIONARY (12th ed. 2024). Or an eviction may be constructive, *i.e.*, when a tenant abandons a property because of an "intolerable situation created by the landlord." *Lehigh v. Richardson*, 460 S.W.2d 830, 832 (Ky. 1970) (citing *Cox v. Hardy*, 371 S.W.2d 945, 946 (Ky. 1963)).

Here, neither an actual eviction nor a constructive eviction occurred as a result of Biggs' actions on October 8. True, Biggs admitted that he damaged the Property on October 8 in order to attempt to remove the Smiths from the Property. However, the Smiths did not leave the Property *as a result* of his actions. In fact, testimony established that after Biggs' initial actions on that day, the parties conversed in the front yard and reached an agreement letting the Smiths remain in the Property for the time being. Biggs' actions did not create a cause of action in self-help eviction because he did not physically remove the Smiths, nor did he create an intolerable situation for the Smiths that forced them to leave. Harper and Biggs ultimately moved forward with a lawful forcible detainer action in early November, and the Smiths were legally evicted through that action. In order for the Smiths to succeed on this claim – absent a physical or constructive eviction – they needed to present caselaw supporting that supposition (that an *attempt* to evict was sufficient); they did not. [6]

---

[6] The Smiths cite to an unpublished case, *Miller v. Muchow*, No. 2022-CA-0862-MR, 2023 WL 2939474 (Ky. App. Apr. 14, 2023), to generally explain forcible entry and detainer proceedings and the ban on self-help evictions. *Miller* involved a landlord who attempted to ouster his tenant, but the tenant did not leave as a result of the landlord's actions. *Id.* at *2. On appeal, this Court did not find liability in a self-help eviction claim because the landlord's attempt to ouster was "unsuccessful," and the landlord's actions more appropriately "serve[d] as the basis for liability for a negligence claim." *Id.* As *Miller* is unpublished, we do not rely on it as binding precedent. *See* RAP 41(A). We merely note that the Smiths' *only cited precedent* addressing self-help eviction law directly refutes their own argument.

As there was no eviction (actual or constructive) due to Biggs' actions on October 8, it would not be "clearly unreasonable" for the jury to find for Harper and Biggs on the self-help eviction claim. *See Belt*, 664 S.W.3d at 530. Moreover, we cannot reverse the trial court's denial of the Smiths' motion for a directed verdict because the jury's result was not "palpably or flagrantly against the evidence." *See Lewis*, 798 S.W.2d at 461 (internal quotation marks and citation omitted). Therefore, the trial court did not err in allowing the jury to decide the self-help eviction claim.

### C. Attorney's Fees

During discovery, Harper requested bank statements from the Smiths showing that they paid the invoices for the work done to the Property while living there. The Smiths turned over their bank statements, but Harper became concerned about their authenticity. Harper's counsel requested his own copy of the Smiths' bank statements directly from their bank and discovered that the statements handed over by the Smiths had been altered. The Smiths testified under oath during depositions as to the authenticity and evidentiary significance of those bank statements. However, Harper deposed a banker from the Smiths' bank who testified that she had reviewed the Smiths' account and had not found any record of the transactions shown in the bank statements tendered by the Smiths. The

Smiths subsequently admitted to altering the bank statements and perjuring themselves during depositions.

In January 2023, Harper filed a motion for sanctions against the Smiths for providing falsified documents and perjured testimony in support of their claim for damages. Harper asserted that sanctions were appropriate because the Smiths' conduct "constitute[d] bad faith and an abuse of the judicial process[.]" Attached to the motion, Harper's counsel included an itemized statement of *all* of Harper's legal costs and fees to date. *Highlighted* within that statement were just those line items that her counsel believed were related to the Smiths' misconduct (time and expenses associated with the depositions and the request for bank records). In total, Harper requested $10,960.50 in costs and fees "incurred in proving gross discovery violations and fraud upon the Court." The Smiths responded, admitted they exercised "poor judgment," but argued the vast majority of the requested costs and fees were "for work that would have been performed regardless of the bank statements." The Smiths amended Harper's highlighted itemized statement, and asserted sanctions should be reduced to $3,726.50 to more accurately reflect the time incurred *as a direct result* of the Smiths' error in judgment.

In March 2023, the trial court entered an order sanctioning the Smiths and awarding attorney's fees for presenting "false evidence to the Court through

-22-

altered bank statements."[7]  The court stated that although Harper requested dismissal of the Smiths' claim, such a result would be "extreme."  Instead, the court believed sanctions would be more appropriate.  The trial court reviewed the itemized legal fees and removed 19 line item charges (totaling $1,175.00) because Harper "would have incurred those expenses in any case[.]"  The remaining fees and expenses amounted to a sanction of $9,515.50.

On appeal, the Smiths do not dispute the sanction itself, but object to the amount of the sanction.  They assert the "vast majority" of the fees are for work that would have been performed regardless of the bank statements.  The Smiths' sole legal argument on appeal is that the trial court may only award sanctions to compensate for fees and expenses the other party would not have incurred "but for" the sanctioned conduct.[8]  The Smiths assert the trial court should have walked through each line item to determine if the legal action would have been incurred "in the absence of the sanctioned conduct."  While we do not accept this legal limitation on a trial court's ability to sanction, what the Smiths are asking for is exactly what the trial court did.

---

[7] The trial court also raised doubt as to the authenticity of the invoices the Smiths provided.  The court noted that the invoices the Smiths attached to their complaint were "remarkably similar" despite being from different companies and were "not above suspicion[.]"

[8] The Smiths only cite to one case from our United States Supreme Court that discussed a federal court's ability to sanction parties, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108-09, 137 S. Ct. 1178, 1186-87, 197 L. Ed. 2d 585 (2017).

Kentucky Rule of Civil Procedure ("CR") 37.02 permits a court to sanction a party and/or deponent for discovery abuse and pay "reasonable expenses, including attorney's fees[.]" Yet even without an explicit violation of "statutory authority or remedial rules," Kentucky courts have authority to invoke their inherent power to impose attorney's fees and related expenses on a party as a sanction for bad faith conduct. *Lake Village Water Ass'n, Inc. v. Sorrell*, 815 S.W.2d 418, 421 (Ky. App. 1991) (citing *Chambers v. Nasco*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)). Indeed, a trial court has broad discretion in addressing a violation of its orders regarding discovery, and we review the trial court's determination of the appropriate sanction for abuse of that discretion. *Rumpel v. Rumpel*, 438 S.W.3d 354, 361 (Ky. 2014) (citing *Turner v. Andrew*, 413 S.W.3d 272, 279 (Ky. 2013)). "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted).

Here, the trial court found the Smiths falsified evidence and perjured themselves, but still did not grant Harper's motion to dismiss, finding dismissal to be too extreme. Instead, the court specifically addressed the line item statement and reduced the requested amount, excluding "amounts from sanctions since it believes [Harper] would have incurred those expense in any case[.]" Harper is

essentially requesting the trial court to repeat what it has already done, but with a different outcome. However, the trial court's imposition of sanctions totaling $9,515.50 was not an abuse of discretion because it was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. "Trial courts need not tolerate deliberate and willful discovery abuse[,]" and they are "afforded great leeway and discretion in entering and enforcing discovery orders." *Bramblett v. Penske Truck Leasing Co., L.P.*, 598 S.W.3d 567, 574 (Ky. App. 2019) (citing *Southern Financial Life Ins. Co. v. Combs*, 413 S.W.3d 921, 932 (Ky. 2013)).

## CONCLUSION

Therefore, we AFFIRM the Order and Judgment of the Henderson Circuit Court.

ALL CONCUR.

| BRIEFS FOR APPELLANTS: | BRIEF FOR APPELLEES: |
|---|---|
| M. Alexander Russell<br>Austin P. Vowels<br>Henderson, Kentucky | H. Randall Redding<br>Sharon W. Farmer<br>Henderson, Kentucky |