RENDERED:  OCTOBER 10, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1232-MR

ROBERT EARL ROMAINE                                     APPELLANT


APPEAL FROM MCCRACKEN FAMILY COURT
v.          HONORABLE DEANNA WISE HENSCHEL, JUDGE
ACTION NO. 23-CI-00342


JESSICA ROSE ROMAINE                                      APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, L. JONES, AND LAMBERT, JUDGES.

CETRULO, JUDGE:  Robert Earl Romaine ("Robert") appeals a family court post-dissolution order and challenges the family court's determinations on parenting time, maintenance, arrearages (for child support and maintenance), contempt, and the award of attorney fees.  After review, we affirm the McCracken Family Court.

## FACTS & BACKGROUND

In 2011, Robert married Appellee Jessica Rose Romaine ("Jessica"). Jessica entered the marriage with a child ("Daughter"), who Robert adopted, and the couple had one child together during their marriage ("Son"). In March 2023, the couple separated, and a contentious divorce ensued. At that time, Daughter was approximately 15 years old, and Son was approximately 9 years old.

In June 2023, the McCracken Family Court entered a temporary agreed mediation order ("2023 Mediation Agreement"). In the 2023 Mediation Agreement, Robert and Jessica agreed to joint custody of both children. Robert worked a 29 days on/29 days off schedule on a riverboat. The parties agreed that while he was working, the children would live with Jessica; when he was not working, *i.e.*, "off the boat," the children would live with Robert but have an overnight with Jessica every Wednesday. Further, the 2023 Mediation Agreement also stated that the parents and children "will participate in family counseling through Compass Counseling." Based on Robert's monthly income of $14,600 and Jessica's monthly income of $1,550, the 2023 Mediation Agreement determined that Robert would pay child support in the amount of $700 per month and maintenance in the amount of $2,100 per month.

In August 2023, the family court entered findings of fact, conclusions of law, and an interlocutory decree of dissolution. This decree dissolved the

marriage but reserved "all issues" for later adjudication. The next month, in September, Jessica moved to modify the parenting time arrangement in the 2023 Mediation Agreement, asserting that her absence from the children for most of the month Robert was off the boat created a hardship for the children. In support of this claim, Jessica submitted letters from both of the children's counselors. Son's counselor stated that Son struggled with being away from his mother and

> that if it were just a week or two, he wouldn't be so anxious, but he has a hard time specifically missing his mother when he goes to dad's. He cries often and makes facetime/phone calls when he is gone and becomes emotional the week prior to having to leave in anticipation of what's to come. For his mental and emotional wellbeing, it is my clinical recommendation to adjust the visitation schedule so that it is not every other month at each parent's home.

Similarly, Daughter's counselor also put forth a letter of concern. In this letter, the counselor suggested that Daughter "be able to speak for herself in regard to visitation with [Robert]." The counselor also stated that Daughter

> is currently struggling with mental health symptoms indicative of trauma reactions. She exhibits anxiety, depression, emotionally intense reactions, and more. [Daughter] also notes being extremely distressed when having to be around [Robert], including their family therapy sessions.

On May 15, 2024, the parties submitted a second Agreed Mediation Order ("2024 Mediation Agreement"). In this 2024 Mediation Agreement, Robert agreed to terminate his parental rights to Daughter. This agreement also allocated

-3-

residences and divided some personal property, but reserved on numerous issues, including but not limited to, parenting time, child support and maintenance arrearages, Jessica's attorney fee claim, outstanding contempt issues, division of property, and matters concerning counseling for Son.

The family court held a final hearing over two days – May 19 and 20, 2024. At this hearing, Robert and Jessica were both present, represented, and testified. Robert called four character witnesses and Jessica called two. Admitted evidence included financial disclosure statements, pay stubs, tax returns, Son's pediatrician's appointment notes, and depositions of the children's counselors. We need not recount the entirety of the two-day hearing, but parts of Robert and Jessica's testimonies are relevant to this appeal.

At the hearing, Robert testified that he was content with keeping the parenting time arrangement as is. Conversely, Jessica stated the current parenting time plan had not been working well. She said Son was struggling being away from her for most of a month and missing counseling appointments while with his father.

Robert acknowledged that he was aware of and signed the 2023 Mediation Agreement – that stated parents and children "will participate in family counseling through Compass Counseling" – but he did not believe that he was required to take Son to counseling. In fact, he admitted he stopped taking Son to

Compass Counseling and did not intend to take him back. Jessica testified that during their marriage Robert had been against the children receiving counseling, but that Son's counseling was extremely beneficial, and Compass Counseling had turned into his "safe space."

At the hearing, Robert argued that the prior personal property division was not equal. Jessica asserted that the personal property in their respective possession was no longer at issue as those property matters had been resolved by the prior mediation agreements, to which the family court agreed. However, on Robert's request, the court stated it would consider the personal property but only in assessing Jessica's need for maintenance, not as items needing valuation or dividing. The parties agreed.

Additionally, the family court heard a detailed walkthrough of Robert's expenses. Over the course of this litigation, Robert had submitted two financial disclosure statements: one in June 2023 with monthly expenses of $5,076, and the second in May 2024 with monthly expenses of $12,512. During the final hearing, Robert explained this $7,436 discrepancy was due to various factors such as increased tithing, house repairs, a new marriage/person to support, medical issues, and typographical errors in the original financial disclosure statement.

His explanation of these factors, however, produced additional inconsistencies. For example, Robert testified his original expense report listed only $46 per month for truck fuel, but he needed $800 per month for truck fuel to drive around Paducah (not including motorcycle fuel or road trips). Robert stated he needed $900 per month for church tithings, but he only presented evidence of one $500 donation in the years prior. Robert requested $450 per month for medication, but admitted he was not currently taking medication and had not been for the previous three months (except for heartburn medicine). He requested $260 per month for braces, but admitted he had dental insurance and did not currently have braces. Also, Robert requested $200 for pet supplies, but did not state he had a pet. (Jessica testified that to her knowledge, Robert did not own a pet.)

Robert also testified that he and Jessica owned two homes prior to the divorce, and after he filed for divorce, he moved into the "second property." He admitted to spending the couple's joint 2022 tax refund on repairs for this second property. He stated Jessica agreed with him to spend the return on this repair prior to the divorce, but Jessica later testified that she did not agree to that expense and argued the joint return was marital property that should be divided equally.

On cross, Robert acknowledged that he filed his divorce petition on April 13, 2023 and knew about Jessica's motion for a status quo order filed on April 18. The family court entered the status quo order on April 26. He admitted

-6-

that without Jessica's knowledge or the court's approval, he borrowed $10,000 on a home equity line of credit ("HELOC") for a new truck on April 19, and another $15,000 on the HELOC on April 27. Jessica stated she did not know Robert borrowed on their HELOC nor that this was available to them. She asserted that as she did not benefit from those purchases, she did not want to absorb that debt.

Further, Robert testified that the Saturday prior to the final hearing, he married a woman named "Cathy." Robert testified that Cathy graduated from the U.S. Military Academy at West Point ("West Point"), previously taught at West Point, and retired from the U.S. Army as a Major. He stated Cathy teaches Arabic to Special Forces but was currently taking a break from teaching. He stated, "She will be going back to work. She's applying for a job with the FBI here in town." During cross-examination, Jessica's counsel asked Robert if Cathy would be contributing to his household income. Robert's counsel objected as to relevance. The family court stated, "I believe it's relevant as far as if there's someone else contributing. . . . I've got his household expenses and if he's supporting another person in his home, I certainly think it's relevant. I'm going to allow it."

Jessica testified that during the marriage, she and Robert had separate bank accounts, and each account only accrued their individual income. Jessica stated she paid for groceries, restaurants, child activities, gas, and some bills. Jessica asserted that occasionally during the marriage, she would have to ask

Robert for money, and he would grant the request, but she stated he would "lecture [her] about being more careful with money."

Jessica testified that working her current job as a teacher's aide allowed her to attend her children's activities and get them to all their engagements. She intended to go back to school for further education, but had put her career goals on hold due to the demands of motherhood. She planned to get her emergency teaching certification (after she takes a few additional classes) and hoped to get a teaching degree within the next four to five years. She requested $3,000 per month in maintenance through this timeframe required to complete her teaching education.

Following the final hearing, the family court entered a final order resolving the remaining dissolution issues ("Final Order") in August 2024. The entirety of the 20-page Final Order is not pertinent here. However, relevantly, the Final Order addressed parenting time, maintenance, arrearage (for child support and maintenance), contempt, and the award of attorney fees.

*As to parenting time*, the Final Order stated:

> In this case, the Court believes that the [KRS[1] 403.270(2)] presumption has been rebutted for a number of reasons. First, Robert testified that he agrees to and believes it is best fo[r] [Son] to see his mother during his parenting time. He agreed to deviate from a true equal parenting schedule in the [2023 Mediation Agreement]. Second, the

---

[1] Kentucky Revised Statute.

testimony of [Son's] counselor is that the child needs to see his mother during the father's parenting time. Finally, Robert's work schedule in and of itself does not lend itself to an equal timesharing schedule.

[] The Court finds that it is not in [Son's] best interest to go long periods of time without seeing either one of his parents. Therefore, the Court enters the following parenting time schedule which maximizes the amount of time the parents can spend with the child while taking into consideration the child's best interest:

a. Jessica shall have the child for the entire 29 days Robert is on the boat.

b. When Robert is off the boat, he shall have parenting time with the child beginning on the second day he is off the boat (at the end of [Son's] school day or at 9 a.m. if school is not in session) until the day before he returns to the boat (Jessica will pick up the child from school or at 5 p.m. if school is not in session).

c. When Robert is off the boat, Jessica shall have the child every Tuesday from after school (or 5:00 p.m. if school is not in session) until Thursday when she takes the child to school (or 9:00 a.m. if school is not in session).

d. During the summer months of June and July when the child is out of school, Robert will have the child for the first 29 day off period Robert is off the boat. Jessica shall have the child two of the four Wednesday overnights of that 29-day period, taking into consideration Robert's planned vacations, if any. . . .

e. The parties will follow the holiday schedule of the McCracken Family Court's Visitation Schedule unless they otherwise agree on holiday parenting time. The parties will have to consider Robert's work schedule when dividing holidays. . . .

*As to maintenance*, the Final Order explicitly stated that it considered all the relevant factors (required by KRS 403.200) in determining that Robert should pay Jessica $2,100 per month in maintenance for 40 months. Noting the discrepancies between Robert's 2023 and 2024 financial disclosures, the family court stated:

> [Robert] testified that his new wife was now living with him and had just left a very good job in Illinois to relocate to Kentucky. She also demands a 10% tithe to church, which he never did before. He anticipated that she would be working very soon and contributing to his household expenses. With that in mind, the Court believes that Robert's reasonable monthly expenses are closer to the $5,076 per month he stated in his original [financial disclosure statement].
>
> [] In her [2023 financial disclosure statement], Jessica originally stated her monthly expenses to be $4,675. It is noted that this did not include a house payment, an expense she assumed pursuant to the [2023 Mediation Agreement]. On her [2024 financial disclosure statement], her expenses had increased to $6,001.35 which included the house payment she has assumed and some other expenses that have increased. The Court finds Jessica's reasonable expenses to be $6,001.35.
>
> [] Jessica has gross monthly income of $1,615.88 and nets approximately $1,248.79 per month. Leaving her with a deficit each month of $4,752.56 per month. Conversely, Robert has gross monthly income of at least $15,246.83 (assuming he does not have overtime/"ride over" pay) which results in net monthly income of $8,956.55. Subtracting out his reasonable monthly expenses leaves him with a monthly surplus of $3,880.55.

[] Jessica has stated her intention to go back to school to secure her teaching certification and has researched getting an emergency accreditation. She estimated the timeframe for completion of that degree to be four to five years. She has requested a maintenance award of $2,500 per month.[2]

[] The Court finds that an award of $2,100 per month for 40 months, effective September 1, 2024, is reasonable in light of the income disparity of the parties, the length of the marriage, the time for Jessica to increase her wages, and the fact that Robert has sufficient means to provide for his reasonable expenses while also contributing to Jessica's.

*As to child support*, the family court also did an equally thorough analysis. The court reviewed Robert's tax returns and credited him the amount paid for Son's health insurance. The court did not impute any "ride over" time (overtime) to his income due to his parental responsibilities. Similarly, the court noted that Jessica had the potential to earn more per month if she switched employment, but the court did not require Jessica to immediately find a higher paying position because she too had "obtained reasonable employment that accommodate[d] her parental duties." Pursuant to the Kentucky Child Support Guidelines, the court calculated Robert's child support payments at $774 per month for Son. Additionally, the family court determined Jessica was entitled to arrearage under the statute "retroactive to when she filed her Response and made

---

[2] During the final hearing, Jessica requested $3,000 per month in maintenance for five years.

-11-

the first demand for maintenance and child support" and gave Robert 60 days to pay the arrearage.

*As to the contempt finding*, the Final Order stated:

The parties' [2023 Mediation Agreement] specifically stated that the parties agreed that the children would attend counseling with Compass Counseling. There is no ambiguity as to that agreement. The Court finds that Robert's testimony that it was not his understanding that the children *had* to attend Compass Counseling when the clear language of the [2023 Mediation Agreement] says otherwise, to be disingenuous at best. The Court has reviewed the depositions of the counselors from Compass Counseling, as well as the counseling records submitted to this Court by agreement, and it is apparent that Robert has had a difficult, if not contentious, relationship with Compass Counseling. Nevertheless, there is a Court order in place stating that the children were to attend Compass Counseling. . . . Therefore, the Court finds that Robert is in Contempt of Court for his willful failure to abide to the lawfully issued orders of the Court. The Court assigns attorney fees to Robert for this Contempt and includes this in the award of attorney fees, below.

Jessica requested attorney fees throughout the litigation, and in June 2024, her attorney presented an affidavit of fees and costs exceeding $31,000. The Final Order awarded Jessica $5,000 toward her attorney fees "[i]n light of Robert's finding of Contempt, the income disparity of the parties, and pursuant to KRS 403.220[.]" Robert appealed.[3]

---

[3] The parties both filed motions to alter, amend, or vacate the Final Order, but the court's resulting orders do not affect the merits of this appeal.

-12-

## ANALYSIS

On appeal, Robert challenges the family court's determinations on parenting time, maintenance, arrearage (for child support and maintenance), contempt, and the award of attorney fees. Jessica did not file a brief in this appeal, but that failure does not negate the thoroughness of the family court's Final Order nor alter our ultimate disposition.

### A. Parenting Time

Family courts are "vested with broad discretion in matters concerning custody and visitation." *Jones v. Livesay*, 551 S.W.3d 47, 51 (Ky. App. 2018) (citations omitted). We review visitation determinations for an abuse of that discretion. *Layman v. Bohanon*, 599 S.W.3d 423, 431 (Ky. 2020) (citing *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). As this matter was tried without a jury, the family court's findings of fact "shall not be set aside unless clearly erroneous[.]" Kentucky Rule of Civil Procedure ("CR") 52.01.

Under KRS 403.270, we review this initial custody determination under the best interests of the child standard, with a rebuttable presumption that joint custody and equal parenting time are in the child's best interests. *Layman*,

-13-

599 S.W.3d at 430.[4]  In determining parenting time, the court may consider, among other factors, the wishes of the parents and child, the child's adjustment, the mental and physical health of the child, and the frequency and the likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent. KRS 403.270.  In the absence of clearly erroneous factual findings or an abuse of discretion, we must defer to the family court's determinations if the court properly considered the factors and requirements of KRS 403.270.  *Barnett*, 584 S.W.3d at 759 (citation omitted).

As previously discussed, according to the 2023 Mediation Agreement, Jessica would have Son full-time while Robert was working on the boat; Robert would exercise his parenting time during his time off the boat, but Jessica would have Son for an overnight every Wednesday during Robert's 29-day parenting window.  However, the Final Order varied from this arrangement and gave Jessica an additional overnight (Tuesday) during Robert's off time.

On appeal, Robert argues the KRS 403.270 presumption of equal parenting time was not sufficiently rebutted and requests a return to the parenting

---

[4] We note, KRS 403.270 is the custody determination statute and KRS 403.320 governs visitation modification.  *Layman*, 599 S.W.3d at 428.  While the Final Order did vary visitation from the prior temporary 2023 Mediation Agreement, it still represented the family court's *initial custody and parenting time determination*.  As such, we shall limit our review to KRS 403.270. *See Barnett v. White*, 584 S.W.3d 755, 759 (Ky. App 2019) (reviewing the court's custody pursuant to KRS 403.270 because it "was the first final order as prior to this time the parties were operating under a temporary custody order.").

-14-

time arrangement detailed in the 2023 Mediation Agreement. He asserts he has worked hard to stay present in Son's life, and there was no reason to divert from the original parenting schedule. He argues the previous arrangement allowed for Son to see his mother during his parenting window (on Wednesdays); thus, Son would see Jessica each week. Therefore, he argues the reduction in his parenting time was arbitrary and an abuse of discretion. We disagree.

Here, the family court exercised its broad discretion in determining that equal parenting time was not appropriate, and the court explicitly stated the KRS 403.270(2) presumption was rebutted. The court noted that at the time of the 2023 Mediation Agreement, Jessica was working at Son's school and thus, mother and child saw each other every school day. However, as Son has aged out of that school, they do not see each other every school day anymore. Further, the court considered the testimony of Son's counselor that it was not in Son's best interest to be away from his mother for the majority of a month.

The family court determined that it was in Son's best interest to live with Jessica while Robert was working and split the parenting time while Robert was off the boat. The court did not disparage nor discourage Robert's relationship with Son, but held it was in Son's best interest to spend Tuesday evening through Thursday morning with Jessica (during Robert's off-work periods). When Robert is off work, he was granted consistent time with Son (including holidays and

vacations); the court required each parent to reach out to the other for additional parenting time if the current custodian needed to be away from Son for more than four hours; and the court encouraged Robert to attend Son's extracurricular activities and to call Son directly every night between 5:30 p.m. and 8:00 p.m. Overall, Robert received approximately 132 overnights per year. Such an arrangement respected, encouraged, and preserved Robert's time with Son while not keeping the child away from his mother for extended periods.

Again, we must give the family court's custody determination "a great deal of deference" because, in part, the court "is in the best position to resolve the conflicting evidence and make the determination that is in the child's best interest." *See Barnett*, 584 S.W.3d at 759 (citations omitted). "Unfortunately, in custody proceedings it is seldom possible for a trial court to impose a [timesharing] regime which makes both parties happy." *Id.* at 762 (quoting *Drury*, 32 S.W.3d at 526). Under these circumstances, we do not find the family court's parenting time determination to be arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *See English*, 993 S.W.2d at 945. Thus, we find no abuse of discretion in the court's parenting time determination.

### B. Maintenance

The award of spousal maintenance "has traditionally been delegated to the sound and broad discretion of the trial court[.]" *Barbarine v. Barbarine*, 925

S.W.2d 831, 832 (Ky. App. 1996) (citations omitted).  On appeal, this Court may only disturb the award of spousal maintenance if the circuit court has "abused its discretion or based its decision on findings of fact that are clearly erroneous." *Powell v. Powell*, 107 S.W.3d 222, 224 (Ky. 2003) (citations omitted); CR 52.01. Again, abuse of discretion occurs when the court's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.  *English*, 993 S.W.2d at 945 (citation omitted).

Robert argues Jessica improperly included expenses for Daughter on her disclosure statement despite his voluntary termination of parental rights. However, during the final hearing, the court stated it would consider Cathy as part of Robert's expenses as she was now living in his home.  Similarly, the court considered Daughter as part of Jessica's expenses as she was living in her mother's home.  Robert does not show how this balanced approach was improper.

Robert argues the family court should have imputed income of Jessica's earning potential, but the court *did* consider Jessica's increased earning potential.  The Final Order noted Jessica's intention of pursuing her teaching certification.  Jessica testified that this additional education would take four to five years, but the court only awarded 40 months of maintenance.  The court noted that 40 months was reasonable and allowed "time for Jessica to increase her wages[.]"

Moreover, the family court noted the increased earning potential of *both* Robert and Jessica, but allowed for each to prioritize their parental duties over making a higher wage. Robert could have, and historically did, ride over to earn additional money, but the court did not impute this overtime on Robert post-dissolution because of his increased parental role. Similarly, Jessica could have earned a higher wage if she left her current position, but again the court allowed Jessica to keep a reasonable job that balanced well with her primary caregiver role.

Next, the Final Order stated that Robert's 2023 financial statement disclosure of $5,076 per month was a more accurate representation of his reasonable expenses than his 2024 financial disclosure statement of $12,512 per month.[5] Robert does not show how that finding was clearly erroneous or how the family court misapplied the applicable law in coming to that conclusion. We note, it is the family court who is in the best position to judge the credibility of the witnesses. *Blackaby v. Barnes*, 614 S.W.3d 897, 900 (Ky. 2021) (citations omitted).

At the two-day final hearing, the family court heard a detailed walkthrough of Robert's expenses. Robert attempted to explain the sizeable increase in his expenses between the 2023 and 2024 financial disclosures, but the

---

[5] Robert also argued the court erred in assessing his actual total income. He states the "trial court used the annual figure of $182,962.00, the source of which is unclear[.]" However, Robert reported his monthly income as $15,246.83. $15,246.83 x 12 months = $182,961.96.

-18-

court was unconvinced. Robert asserted that he needed $800 per month (for the months he was off the boat), not for out-of-town travel, but for driving around Paducah. He stated that Cathy mandated a 10% tithe, but he did not put forth evidence establishing the existence of those payments. He testified that he was not currently using $450 worth of medicine per month, nor had he been for three months. He acknowledged having dental insurance and did not currently have monthly expenses for braces. He requested $200 for pet expenses without establishing he had a pet. During the final hearing, the court considered Cathy's future contributions to Robert's household income because Robert acknowledged Cathy's impressive resume and stated, "She will be going back to work."

In awarding Jessica maintenance, the family court clearly considered the factors within KRS 403.200[6] including, but not limited to, the parties' monthly

---

[6] KRS 403.200(2) lists factors for the court to consider before allocating maintenance:

   (a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

   (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

   (c) The standard of living established during the marriage;

   (d) The duration of the marriage;

expenses, the financial resources of the parties, Jessica's ability to meet her needs independently, and her role as the primary caregiver to Son. The final hearing adduced testimony discussing their standard of living, including travel, activities, entertainment, and clothing expenditures. Testimony included aspects of the parties' *and* the children's health, ages, and emotional conditions. The court limited maintenance to less than four years, despite Jessica's further education possibly taking four or more years to complete. The court properly utilized KRS 403.200 to enable Jessica to acquire the skills necessary to support herself in the current workforce so that she need not rely upon the maintenance from Robert indefinitely. *See Powell*, 107 S.W.3d at 224 (citing *Clark v. Clark*, 782 S.W.2d 56, 61 (Ky. App. 1990)). The court allowed each party to stay in their respective homes, with their respective vehicles. Robert has not shown the court's maintenance award to be an abuse of discretion, unjust, or undue hardship.

### C. Arrearages (Child Support and Maintenance)

In her April 2023 response to Robert's petition for dissolution, Jessica explicitly requested the family court to order Robert to pay child support and maintenance. The court ultimately granted that request, and the Final Order

---

(e) The age, and the physical and emotional condition of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

directed Robert to pay child support and maintenance arrearages backdated to Jessica's initial April 2023 written request. Prior to the Final Order, the parties had agreed to maintenance and child support in their Mediation Agreements, but had "reserved on retroactivity."

We review the family court's resolution of purely legal issues such as questions of statutory interpretation under the non-deferential *de novo* standard. *Artrip v. Noe*, 311 S.W.3d 229, 231 (Ky. 2010) (citation omitted). Under KRS 403.160(2)(a) – which concerns motions for temporary child support – a family court is allowed to award child support retroactive to the date of the original written request. Caselaw permits this retroactive award for maintenance even though the maintenance statutes generally contemplate prospective relief based on a motion supported by an affidavit. *Pursley v. Pursley*, 144 S.W.3d 820, 828-29 (Ky. 2004).

In *Weldon v. Weldon*, 957 S.W.2d 283, 286 (Ky. App. 1997), this Court upheld an award of maintenance retroactive to the date of the wife's *oral* motion to the domestic relations commissioner for temporary child support and maintenance. *See also Higbee v. Higbee*, 89 S.W.3d 409, 410 (Ky. 2002) (upholding an award of maintenance retroactive to the date the wife filed exceptions to the report of the domestic relations commissioner).

First, Robert challenges the retroactive nature of his obligations on procedural grounds, but he does not sufficiently support that assertion. He argues Jessica's April 2023 response does not preserve the request; he asserts Jessica needed an independent motion – separate from her response – in order to set a "start date" for child support and maintenance.

Robert cites *Holland v. Holland* for the contention that an independent *motion* is required before a trial court may grant retroactivity of child support. 290 S.W.3d 671 (Ky. App. 2009). However, that contention is not consistent with this Court's holding in *Holland*. *Holland* held that, pursuant to KRS 403.213, a "written motion for *modification* is required before a trial court may change a child support award." *Id.* at 675 (emphasis added). First, the *Holland* Court did *not* explicitly state that the motion must be independent from a response and/or distinct from any other written request. Instead, the *Holland* Court stated the trial court did not have authority to reduce child support payments "in the absence of a *written request* for modification." *Id.* (emphasis added). This Court did not state such a request must be a standalone written motion. Second, the *Holland* Court was addressing the timeliness of a *modification* of pre-determined child support. Here, not only do we have a "written request" (in Jessica's response), but we are *not* addressing a *modification* of child support under KRS 403.213. We are addressing the retroactive application of child support and maintenance in the court's *initial*

child support and maintenance determination. The parties reserved on retroactivity, and the Court ultimately ruled, within its discretion, that the obligation could be retroactive. *Higbee*, 89 S.W.3d at 410.

Second, Robert argues he should be credited for additional payments he made toward Jessica's household bills prior to the initial maintenance agreement. Yet, the family court was well aware of these payments when it determined arrearages were appropriate. In a December 2023 Order, the court addressed a motion for contempt filed by Jessica that alleged Robert unilaterally reduced his monthly payment obligations in light of other expenses he was paying on Jessica's behalf. In a subsequent order, the court generously did not hold Robert in contempt for failing to pay as ordered stating:

> While [such reductions] may make logical sense to [Robert], this is not the appropriate way to make payment with family Court litigation. The Court clarifies that he is to pay the entire child support obligation monthly. If there are expenses that need to be reimbursed, those shall be paid separately. The accounting issues that arise when parties start giving themselves credit, as well as the attorney fees, do not make the convenience of discounts/credits worthwhile. Further child support and maintenance payments shall not include any self-imposed discounts/credits.

Hence, the family court was aware of Robert paying some of Jessica's household bills after the separation, considered those when it deemed arrearages were appropriate, and Robert does not show how the court's arrearage

-23-

determination was improper. Under these circumstances and considering the discretionary nature of the issues, we find no abuse of discretion or reversible error in the court ordered arrearage obligations.

### D. Contempt

Robert challenges the family court's finding of contempt. Again, we review a family court's exercise of its contempt powers for an abuse of discretion, but we utilize the clearly erroneous standard to the court's underlying factual findings. *Getty v. Getty*, 581 S.W.3d 548, 568 (Ky. 2019) (citations omitted). Robert does not cite any caselaw, but appears to argue the family court erred in interpreting its own order. The 2023 Mediation Agreement stated:

> The parents and the children will participate in family counseling through Compass Counseling (or other mutually agreed upon provider if Compass is unavailable or unwilling) to work on/repair their relationship and participate in the process as recommended by the counselor(s).

In violation of this agreed order, Robert refused to take Son to his counseling appointments at Compass Counseling when those appointments were within his parenting time. Jessica moved the court to compel Robert to take Son to counseling (when those appointments occurred during his parenting time) and moved for the court to hold Robert in contempt. After giving Robert an abundance

of grace on other deviations,[7] the court held Robert in contempt in the Final Order. This order determined there was no ambiguity in the 2023 Mediation Agreement as to the parents' obligation to bring Son to counseling. The court found "Robert's testimony that it was not his understanding that the children *had* to attend Compass Counseling when the clear language of the [2023 Mediation Agreement] says otherwise, to be disingenuous at best." Therefore, the court found Robert in contempt "for his willful failure to abide to the lawfully issued orders of the Court."

On appeal, Robert argues the language within the 2023 Mediation Agreement that he signed (and the court entered) was ambiguous, thereby making the finding of contempt in the Final Order improper. Robert appears to argue that the 2023 Mediation Agreement language "will participate in family counseling" actually means something akin to "may choose not to bring Son to counseling." We do not agree. Again, we note, "the family court is in the best position to judge the credibility of the witnesses and weigh the evidence presented." *Williford v. Williford*, 583 S.W.3d 424, 429 (Ky. App. 2019) (citing *Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012)).

---

[7] For instance, Robert and Jessica agreed not to track the children's locations when the children were with the other parent, but Jessica presented evidence that Robert tracked the children when they were with her. Also, Robert and Jessica agreed not to make one-sided medical decisions or change counselors without the other's approval, but Robert admitted to taking Son (one-time) to a different counselor (during school hours and without Jessica's knowledge or agreement).

-25-

The terms of a settlement agreement set forth in a decree of dissolution of marriage are enforceable as contract terms. KRS 403.180(5). "[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (citing *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000)). "Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002) (citations omitted). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Id.* (citation omitted).

Despite our *de novo* review, we note our agreement with the family court, and we do not find the 2023 Mediation Agreement language ambiguous. We do not believe language that states the children "will participate in family counseling" permits Robert to forego and/or dismiss Son's counseling appointments during his parenting window. As the language is unambiguous, and Robert intentionally, willfully disregarded the agreement/order, the family court's finding of contempt was not improper as a matter of law nor an abuse of discretion.

**E. Attorney Fees**

The Final Order directed Robert to pay $5,000 of Jessica's attorney fees. On appeal, Robert argues the attorney fees were improper because the contempt finding was improper; income disparity is no longer the standard for an award of attorney fees in a dissolution action; Jessica fraudulently filed for an emergency protective order and criminal charges; and the award is "clearly inequitable." As Robert merely mentions those arguments without further support, we will not address the specifics of each individually. "We will not search the record to construct [the appellant's] argument for him, nor will we go on a fishing expedition to find support for his underdeveloped arguments." *Prescott v. Commonwealth*, 572 S.W.3d 913, 923 (Ky. App. 2019) (citation omitted). We nonetheless will address Robert's argument that the attorney fees were improper to this extent.

Under KRS 403.220, a family court may order one party to pay a "reasonable amount" of attorney fees of the other party, if the parties' resources are disparate and/or "to sanction or discourage conduct and tactics which waste the court's and attorneys' time." *Rumpel v. Rumpel*, 438 S.W.3d 354, 363 (Ky. 2014) (internal quotation marks and citations omitted). We review an award of attorney fees for an abuse of discretion. *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky. 2004) (citation omitted). Again, such an abuse occurs when a decision is "arbitrary,

unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945 (citation omitted).

The financial disparity between Robert and Jessica is well-established; the contempt finding was proper; and the court ordered Robert to pay only $5,000 of Jessica's (then) $31,187 attorney fee bill. There is nothing arbitrary, unreasonable, unfair, or unsupported about this $5,000 award. As such, we find no abuse of discretion in the nominal attorney fee award.

## CONCLUSION

Therefore, we AFFIRM the Final Order of the McCracken Family Court.

ALL CONCUR.

BRIEF FOR APPELLANT:            NO BRIEF FOR APPELLEE.

Bradly A. Miller
Paducah, Kentucky