RENDERED: DECEMBER 12, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0057-MR

SCOTT WILLIAM MITCHELL            APPELLANT

v.        APPEAL FROM SHELBY CIRCUIT COURT
HONORABLE S. MARIE HELLARD, JUDGE
ACTION NO. 17-CI-00525

CHER BEILFUSS MITCHELL           APPELLEE

AND

NO. 2024-CA-0746-MR

SCOTT WILLIAM MITCHELL            APPELLANT

v.        APPEAL FROM SHELBY CIRCUIT COURT
HONORABLE S. MARIE HELLARD, JUDGE
ACTION NO. 17-CI-00525

CHER BEILFUSS MITCHELL            APPELLEE

<u>OPINION AFFIRMING IN PART,
REVERSING IN PART,
VACATING IN PART, AND REMANDING</u>

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND MOYNAHAN, JUDGES.

MOYNAHAN, JUDGE: Appellant, Scott William Mitchell ("Billy"), appeals the December 18, 2023, judgment of the Shelby Circuit Court which divided some marital properties and retirement accounts in a dissolution of marriage action. Billy also appeals the April 24, 2024, order of the Shelby Circuit Court which awarded legal costs and attorney's fees to Appellee, Cher Beilfuss Mitchell ("Cher"). After careful review of the relevant law, the submitted briefs, and the record on appeal, we affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this Opinion.

## BACKGROUND

The parties in this case had a tumultuous and complex history. They married in September 2011 after a relatively short relationship. Billy worked as a pilot for Southwest Airlines and lived in Kentucky. Cher worked in the pharmaceutical industry and lived in California with her two minor children from a prior marriage.

At the time of marriage, Billy had three retirement accounts through Southwest – the first was a Southwest Airlines Pilots Savings Plan ("the

SWAPA"); the second was a Southwest Airlines Profit Sharing Plan ("the SW Profit Share"); and the third was a Southwest Airlines Retirement Plan facilitated through Internal Revenue Code § 401(a)(17) ("the 401(a)(17)). Cher had two retirement accounts at the time of marriage and opened a third after the entry of the parties' decree of dissolution. The parties do not contest the characterization and division of Cher's retirement accounts.

Billy moved to California immediately after the parties married and the two lived together until February 2012 at which time they separated for a brief period. Billy moved back to Kentucky, but the parties later reconciled. Cher sold her house in California, quit her job in California, and moved to Kentucky, though she spent the majority of her time in temporary housing in Minnesota.[1]

In early January 2013, the parties sought a new home in Kentucky together and eventually purchased a piece of property ("the farm"), which included a home and stables for boarding horses. The purchase price of the farm was $555,000 and Billy contributed $140,000 for a down payment. In February 2013,

---

[1] After Cher sold her home in California, her children moved to Minnesota, where her ex-husband lived, pursuant to the custody arrangement between herself and her ex-husband. This custody arrangement was an issue of contention throughout the parties' relationship and during the hearing below. The arrangement provided that Cher's children would primarily reside with her during the school year, and that Cher could live in Minnesota, California, or any other state which Cher and her ex-husband could agree. As can be surmised from the following factual background, Cher and her ex-husband could not agree for Cher to be allowed to relocate to Kentucky with the children, and the Minnesota courts did not approve of the relocation either.

the parties' relationship became strained again, and Billy filed an initial petition for dissolution in Kentucky. Again though, the parties reconciled, and the circuit court eventually dismissed Billy's petition for a lack of prosecution.[2]

For the next several years, Cher split her time between Minnesota and Kentucky. Billy visited Cher a handful of times in Minnesota and Cher would occasionally come to Kentucky and stay at the farm. The parties would regularly communicate and engaged in different business ventures and home improvements projects together. Namely, Cher set up a business entity for the parties to be able to make some income boarding horses on the farm. She also invested approximately $500,000 in another business entity ("Derby LLC") which the parties created in order for Billy to make additional income through investments. At some point during this time, Cher obtained a Kentucky pharmaceutical license and attempted to maintain employment in Kentucky, though that endeavor was short-lived considering the amount of time she spent in Minnesota.

Eventually, Cher's visits to Kentucky dwindled and the marriage deteriorated after Cher expressed her desire to purchase a permanent home in Minnesota. Billy filed a second petition for dissolution in October 2017. Again, the parties attempted to reconcile, but Cher eventually responded to the dissolution petition in May 2018, after she claimed to have discovered that Billy had

---

[2] Shelby Circuit Court, Case No. 13-CI-00085.

extinguished all of the funds contained in Derby, LLC. Still, the parties continued to regularly communicate and as of July 2019, were still considering salvaging the marriage.

Beginning in September 2019 and lasting until April 2020, Billy began investing in American Battery Metals ("ABAT") stock through his SWAPA.[3] In total, he obtained approximately five million shares. Beginning in March 2020, Billy also began making withdrawals from the SW Profit Share.

The circuit court issued a bifurcated decree of dissolution on November 19, 2020, and reserved all other issues, including distribution of property, for a final hearing. It did not enter any orders requiring the parties to maintain the status quo of their finances and properties. Within days after the entry of the divorce decree, by late December 2020, the value of Billy's SWAPA had skyrocketed due to the increase in its ABAT stock price by more than twelve-fold. At the same time, Billy transferred his SWAPA account assets into a Charles Schwab Roller IRA Account #5432 ("the IRA Rollover"). Bolstered by the ABAT stock price surge, the IRA Rollover ballooned to more than $16.6 million by January 31, 2021. But just as quickly as it spiked, the ABAT stock price fell substantially in the following weeks – such that by March 2021, it had lost more than half its value. With no court orders restricting money movements, Billy

---

[3] The majority of this investment account was self-directed by Billy.

began transferring funds from the IRA Rollover to separate accounts in his control in early 2021 – including a $89,941 net transfer out in February, a $301,471 net transfer out in March 2021, and a $1,079,476 net transfer out in April 2021. These subtracting transfers totaled $1,470,888 by April 30, 2021. But the vast majority of the IRA Rollover's substantial drop – it had fallen to a $7,309,235 balance by April 30 – was due to a market value loss of $8,194,425 in the preceding two months – driven by ABAT's stock price decline.

Over the next two years the parties engaged in extensive discovery regarding the parties' finances, and a final hearing regarding ultimate property disposition was continued several times. During this time, Cher filed two different motions to compel Billy to comply with discovery, one on November 1, 2021, and another on December 20, 2021. In ruling on the November 1, 2021, motion, the circuit court passed the issue of attorney's fees generally. Billy also filed a motion to compel Cher to comply with discovery on August 22, 2022; the circuit court reserved the issue of attorney's fees in an order entered on September 1, 2022. A final hearing for the distribution of property eventually occurred on December 4, 2023.

At the beginning of the hearing, the parties agreed that the farm would be sold, and the proceeds divided proportionally as decided by the circuit court. They also agreed that, in addition to the initial $140,000 put down by Billy,

$202,046.78 was paid throughout the marriage. Between the date of dissolution and the final hearing, Billy paid an additional $90,083.60, so the total amount of equity in the farm at the date of the hearing was $432,130.38.

Billy testified first. Billy acknowledged that Cher set up the horse boarding business at the farm and supplied the initial funding for Derby, LLC; however, he claimed the horse boarding business never made a profit and all the funds from Derby, LLC were eventually depleted. Regarding the ABAT stock, Billy testified that he sold some of the stocks after the parties' divorce to lock in the gain and avoid losing money and that he would have preferred to sell them sooner. He recognized that he paid a significant amount of taxes on the withdrawals he made from his retirement accounts. He conceded that those actions were taken without informing Cher.[4] During Billy's cross-examination, the circuit court heard a recorded phone conversation between the parties from July 2019 in which the parties discussed not wanting to get a divorce. This phone call was presented in response to Billy's claim that the parties separated in 2013. In the conversation, Billy made physical threats and several racially charged comments directed towards Cher's ex-husband and the Minnesota judge presiding over Cher's child custody case.

---

[4] Notably, Cher acknowledged that Billy was not prohibited from these actions, as no orders to maintain the status quo of the parties' finances were ever entered.

Missy DeArk, Billy's financial expert, testified next. At the request of Billy's counsel, she traced Billy's SWAPA and the SW Profit Share from the date of the parties' marriage to a variety of other dates – the latest of which being July 2019 – and calculated the amount of marital and nonmarital portions. She did not trace funds after November 2020 and conceded that tracing funds after the period in which Billy began withdrawing and transferring funds from his retirement account presented a challenge. Pressed on the question of what happened to the funds in Billy's IRA Rollover, she pointed out that the main loss in the first few months of 2021 came from the market valuation decline, not Billy's transfers out.

Cher testified that sometimes when she would come to Kentucky, she would clean litterboxes, clean garbage out of the house, and run errands for the farm. Cher further testified that she set up the horse boarding business and estimated the parties made around $3,000 per month, of which Billy received the funds. She stated Billy encouraged cash payments from the boarders and believed he would use the funds to make mortgage payments on the farm. For the most part, a third party hired by the parties completely managed the horse boarding business. Regarding Derby, LLC, Cher testified that she gave $500,000 to start it up and did not inquire any further about it because she had faith in Billy's ability to effectively manage investments.

Cher's financial expert, Tami Clemenza, traced seven of Billy's different retirement accounts. In agreement with Ms. DeArk, Ms. Clemenza explained that tracing funds was difficult after January 31, 2021, because of the number of transfers and withdrawals in which Billy engaged. Regarding the SWAPA, Ms. Clemenza testified that between November 19, 2020, and December 31, 2020, the account increased by approximately $6 million, all of which was attributable to passive growth caused by the increase in value of the ABAT stock. As noted above, Billy then transferred the bulk of the monies from the SWAPA (approximately $6.3 million) to the IRA Rollover on January 14, 2021. By January 31, 2021, the IRA Rollover had amassed approximately $10 million in additional value, peaking at the previously noted figure of $16.649 million. Using the information from the IRA Rollover, Ms. Clemenza calculated a marital portion of $9,528,459 as of January 31, 2021. Further analysis of the retirement accounts' valuations as the ABAT stock price declined in 2021 were not performed.

On December 18, 2023, the circuit court issued an order in which it found an equal distribution of the marital portion of Billy's retirement accounts to be appropriate. Using Ms. Clemenza's calculations for those accounts, the circuit court awarded Cher payment in the total amount of $4,880,126: $4,764,230 from the SWAPA as transferred into the IRA Rollover as of January 31, 2021; $113,834 from the SW Profit Share as of March 12, 2020; and $2,063 from the 401(a)(17) as

of November 19, 2020.[5]  Additionally, the circuit court awarded interest on this amount pursuant to Kentucky Revised Statute ("KRS") 360.040.  The circuit court also found that Billy's nonmarital portion of the equity in the farm was $140,000 (which it calculated to be 32%) and ordered that the proceeds from the sale of the farm be divided to the parties, proportionally.  While the circuit court recognized that Billy paid an additional $90,083.50 after the date of dissolution, it found that it would be inappropriate to credit this amount to him because of the facts that he retained exclusive occupancy of the farm since November 19, 2020, and continued to receive the monies from the horse boarding, which it determined to be approximately $3,000 per month.

Billy filed a notice of appeal with this Court and subsequently filed a motion to alter, amend, or vacate pursuant to Kentucky Rule of Civil Procedure ("CR") 59.05 with the circuit court.  Two weeks after the December 18, 2023, judgment and before the circuit court ruled on the CR 59.05 motion, Cher filed a motion for attorney's fees and costs for her financial expert.  The circuit court denied Billy's CR 59.05 motion in February 2024 and granted Cher's motion for attorney's fees and costs on April 24, 2024.  Billy filed another CR 59.05 motion

---

[5] Billy does not contest the marital and nonmarital proportions of the SW Profit Share and the 401(a)(17) as calculated by Cher's expert and found by the circuit court, though he does challenge the circuit court's award of 50% of the marital portions of those accounts.

in response to the April 24, 2024, order which the circuit court denied in June 2024.

On appeal, Billy contests the characterization and division of the party's property, the post-judgment interest awarded on an equalization payment awarded to Cher, and the award of the attorney's fees and costs to Cher.

**ANALYSIS**

**I.**      **<u>Property Division</u>**

The circuit court must follow a three-step process in dividing the parties' property in a dissolution of marriage action: "(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties." *Travis v. Travis*, 59 S.W.3d 904, 908-09 (Ky. 2001). Distribution of property becomes more complex of an endeavor when property has both marital and nonmarital components, such as when property increases in value after the date of a bifurcated decree of dissolution, but before the final order dividing property. *See Smith v. Smith*, 235 S.W.3d 1, 5 (Ky. App. 2006).

When characterizing property, there is a presumption that all property acquired during the marriage is marital. *Travis*, 59 S.W.3d at 905 (citing KRS 403.190(3)). Property obtained after a decree of dissolution is entered, on the other

-11-

hand, is not marital. *See* KRS 403.190(2)(c).[6] Whether an increase of value to a property is marital or nonmarital in nature depends on *why* the increase occurred. *Goderwis v. Goderwis*, 780 S.W.2d 39, 40 (Ky. 1989). This Court has held that a mere passive appreciation due to "general economic conditions" is marital whereas an increase attributable to the "efforts of only one of the parties" is not. *See Culver v. Culver*, 572 S.W.2d 617, 623 (Ky. App. 1978). "The question of whether an item is marital or nonmarital is reviewed under a two-tiered scrutiny in which the factual findings made by the court are reviewed under the clearly erroneous standard and the ultimate legal conclusion denominating the item as marital or nonmarital is reviewed *de novo*." *Smith*, 235 S.W.3d at 6 (footnote and citations omitted).

Once property has been characterized and nonmarital property has been assigned, a circuit court must finally divide marital property. KRS 403.190(1) directs that a circuit court:

> shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors including:
>
> (a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;

---

[6] While KRS 403.190(2)(c) specifically excludes property acquired after a decree of legal "separation," it is similarly applicable to property acquired after a bifurcated decree of dissolution is entered, but before a final order dividing all marital property is entered.

(b) Value of the property set apart to each spouse;

(c) Duration of the marriage; and

(d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

A circuit court is not obligated to divide marital property equally, instead it only needs to divide the marital property in what it deems to be "just proportions." *Smith*, 235 S.W.3d at 6. However, it is well established that actual engagement with the KRS 403.190(1) factors when dividing marital property is necessary in a proper division. *Thielmeier v. Thielmeier*, 664 S.W.3d 563, 574 (Ky. 2022). Regarding the contribution of each spouse to the acquisition of marital property, the courts have held that "contribution" has both "tangible and intangible components that must be weighed." *Gaskill v. Robbins*, 282 S.W.3d 306, 317 (Ky. 2009).

In dividing marital property, a circuit court may sometimes be required to make findings concerning the value of certain pieces of property. Normally, marital property is to be valued at the date of dissolution or the date of a final hearing dividing marital property. *See* 403.190; *see Stallings v. Stallings*, 606 S.W.2d 163, 164 (Ky. 1980); *see also Thielmeier*, 664 S.W.3d at 573. However, this is not a bright-line rule, and a circuit court has discretion to consider different

-13-

dates to reasonably approximate the value of marital property. *See Gaskill v. Robbins*, 361 S.W.3d 337, 340 (Ky. App. 2012) (citing *Clark v. Clark*, 782 S.W.2d 56, 59 (Ky. App. 1990)). We will not disturb a circuit court's valuation unless the decision is contrary to the weight of the evidence. *Id*. at 339.

Unlike issues pertaining to characterization of property, "issues pertaining to the division of marital property upon divorce are reviewed under an abuse of discretion standard." *Overstreet v. Overstreet*, 144 S.W.3d 834, 838 (Ky. App. 2003) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

With this in mind, we will first address Billy's arguments that the circuit court mischaracterized the equity in the farm, mischaracterized his retirement accounts, and used an arbitrary date in valuing the accounts. Then, we will address whether the circuit court properly utilized KRS 403.190 in dividing the parties' property.

**A.      The Farm**

Billy argues that the circuit court erred in characterizing the additional $90,083.60 that he paid towards the farm's mortgage after the date of dissolution as marital property and in not crediting it to him. We agree.

-14-

In support of his position, Billy cites to *Gibson v. Gibson*, 597 S.W.2d 622 (Ky. App. 1980). While the facts of *Gibson* are distinguishable from the case at hand,[7] its reasoning, when read in conjunction with *Culver*, *supra*, is not. In *Gibson*, this Court specifically held that a wife "should not be entitled to share the benefits of the increase in equity [after the entry of a decree of dissolution] brought about by the reduction of the principal amount of the indebtedness [by husband] *although she should be entitled to share in any increase in value brought about by inflation or other market conditions*." *Id.* at 623 (emphasis added) (footnote omitted). In *Culver*, this Court reversed a decision of a trial court when it improperly characterized some property acquired after the decree of dissolution as marital, without any proof being presented that it was acquired with marital property. 572 S.W.2d at 622-23.

It is uncontested that Cher did not personally contribute to the mortgage payments after the decree of dissolution. She instead argues that Billy was using marital funds from the horse boarding business to make the mortgage payments. However, besides the fact that horses are still being boarded at the

_____

[7] *Gibson* dealt with the enforceability of a judgment requiring a husband to continue to make mortgage payments after the decree of dissolution. 597 S.W.2d at 623. In other words, *Gibson* contemplated prospective equity, whereas *sub judice*, the mortgage payments have already been made and are not merely prospective. Additionally, *Gibson* specifically considered the portion of KRS 403.190 which addresses the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children. *Id.* The parties in this case have no children in common so this portion of KRS 403.190 is inapplicable.

farm, the only other evidence Cher offered in support was merely speculative. She testified that she believed Billy would sometimes use income received from the horse boarding business to make mortgage payments in the past and she estimated the horse boarding business brought in approximately $3,000 per month. No other evidence was presented.

Using only Cher's testimony, the circuit court simply found Billy received income from a marital business – a business for which no findings regarding its value were made – and that Billy "most likely" used marital funds to pay the mortgage. Cher had the burden to prove that the increase in equity was obtained using marital funds. *Culver*, 572 S.W.2d at 620. Based on a review of the record, Cher did not meet this burden with the conjectural testimony she proffered. *Cf. Goderwis*, 780 S.W.2d at 40-41 ("At trial the husband did not prove the value of the garage business at the time of the marriage other than to state that the business was 'ready to take off.'"). Thus, this finding was clearly erroneous.

Given the lack of substantial evidence presented on the horse boarding business, and that the increase in equity was directly attributable to Billy's payments, the circuit court erred in characterizing the $90,083.60 as marital property. It should have been characterized as nonmarital and therefore it should have been assigned to Billy pursuant to the second step of *Travis*. Thus, Billy's total nonmarital portion of the farm's equity should have been $230,083.60

($140,000 + $90,083.60), which equates to a nonmarital proportion of 53% ($230,083.60 / 432,130.38). *See Brandenburg v. Brandenburg*, 617 S.W.2d 871, 872-73 (Ky. App. 1981).

**B.          Retirement Accounts**

Regarding his retirement accounts, Billy first argues that the circuit court erred in using a date beyond the bifurcated decree of dissolution in its valuation of his SWAPA as transferred into his IRA Rollover.[8]  In doing so, Billy presumes that any increases to the value of his retirement accounts after November 19, 2020, is nonmarital in nature, and so should have been credited to him.  On this point, we disagree.

As stated above, there is a distinction between active and passive increases to the value of a marital property.  *See Culver*, 572 S.W.2d at 623.  In this case, it is uncontroverted that the entirety of the increased value of Billy's IRA Rollover (and his SWAPA before the funds were transferred) was due to the price spike of the ABAT shares – all of which Billy acquired prior to the dissolution decree, utilizing a portion of marital funds in his retirement accounts.  Billy made no other contributions between the decree date, November 19, 2020, and the date of valuation for Billy's IRA Rollover chosen by the court – January 31, 2021.  As

---

[8] Billy proposes that the circuit court should have used the value of the SWAPA as of November 30, 2020, which was the statement date closest to the date of the decree of dissolution.

such, there is no error in the circuit court's inclusion of the increase in value of Billy's retirement accounts after November 19, 2020, as marital property to be divided.

Billy also argues that the specific date of January 31, 2021, used by the circuit court was arbitrary – and functionally overvalued the retirement funds in question based on transient and unrealized gains. On this point, we agree.

The circuit court's decision to use January 31, 2021, instead of another date, factors into the final step of *Travis* – equitably dividing the marital property.[9] When the circuit court issued its bifurcated dissolution decree on November 19, 2020, it did not issue an accompanying order restricting the parties from transferring funds. Not surprisingly, then, in the weeks that followed, as ABAT's skyrocketing price created a huge financial gain in the IRA Rollover *on paper*, Billy took steps to reduce exposure to the stock's decline. Looking back, however, those transfers muddied the waters – as both experts testified that a precise valuation of the retirement accounts through the date of the final hearing – some three years later – was essentially impossible, given the number of transactions that subsequently occurred.[10] The right question, in the case *sub*

_____

[9] Regarding the second step of *Travis*, neither party contests the assignment of Billy's nonmarital portions of his retirement accounts.

[10] By not understanding prior to the hearing that the court was considering a valuation of Billy's retirement accounts beyond the dissolution date, Billy's expert was largely unprepared to offer

*judice*, was not whether an accurate valuation could be made of the retirement accounts through the final hearing date, but whether a valuation could have been made using a date after the divorce decree that reflected only the *true* gain from the ABAT stock price increase, and not one skewed by a momentary peak valuation that occurred near the end of January 2021. As it was, the circuit court's selection of January 31, 2021, for the IRA Rollover valuation, had the effect of capturing a massive increase in value that was largely *transitory* due to the rapid subsequent decline in ABAT's stock price. While it was not an abuse of discretion for the circuit court to select a date beyond the divorce decree, the court's selection of January 31, 2021, was unreasonable because it unfairly shifted the ABAT windfall to one party at the expense of the other.

As mentioned, the ABAT stock price drove a rapid increase in Billy's IRA Rollover account, but most of that gain went unrealized. It is true that Billy made transfers out in February and March 2021, but as a percentage of the account's total value, they were modest: 0.7% in February, and 3.7% in March.[11] In effect, Billy's continuing decision in the early months of 2021 to leave the vast

---

analysis on the impact of ABAT's price spike and subsequent decline on Billy's IRA Rollover account.

[11] Per Defense Exhibit B-2, the net transfer out of the IRA Rollover in February 2021 was $89,941, while the ending balance that month fell to $13,205,816 – largely due to ABAT's decreasing valuation. In March 2021, the net transfer out was $301,471, while the ending balance had decreased to $8,063,428 – again due largely to ABAT's falling price.

majority of his $16.6 million retirement portfolio in place – turned out to be a losing prospect. But just as he should not reap the entire benefit of the ABAT stock price surge (as he would if the divorce decree date were used by the circuit court), he should not bear the entire brunt of the stock price's rapid decline.[12]

Once the circuit court decided to value Billy's IRA Rollover on a date after the divorce decree – to include the passive gain caused by the ABAT price surge – it had a responsibility to carefully examine how much of the portfolio surge was realized in the subsequent months. Given the circumstances, as outlined above, the circuit court's selection of January 31, 2021, as the valuation date for the IRA Rollover, without also accounting for the significant loss in the value to the account in the following weeks, was an abuse of discretion and contrary to the weight of the evidence. *See Gaskill*, 361 S.W.3d at 339.

## C.        Application of KRS 403.190

Billy's remaining arguments concerning property division are that the circuit court did not properly follow KRS 403.190 in its division of marital property. He specifically asserts the circuit court did not engage in a proper

---

[12] We recognize that Billy's administration of his retirement accounts makes the process of justly apportioning any losses from the ABAT stock to the parties challenging. Matters are further complicated because the circuit court can also not apportion any increases in value to the funds of Billy's advancements from those accounts. However, the circuit court is not without options. To account for Billy's transfers out in February and March 2021, for example, his ultimate portion of the IRA Rollover could be deducted to reflect those advancements to himself.

consideration of the KRS 403.190 factors and that it gave undue regard to marital misconduct, namely the July 2019 phone call.

To begin, while the circuit court did not explicitly cite to the KRS 403.190 factors in its December 18, 2023, judgment, it still sufficiently considered those factors in its division of marital property. Furthermore, in an effort to clarify its ruling, the circuit court specifically identified and summarized its findings on each KRS 403.190(1) factor in its order denying Billy's first CR 59.05 motion.

In this case, the circuit court clearly considered tangible and intangible contributions made by the parties, including: both parties' financial contributions to their retirement accounts; Cher's sacrifices in selling her home in California, time spent flying to and from Kentucky, and changes in her career to try and accommodate Billy's desire to live in Kentucky; Cher's financial contribution to Derby, LLC; and Cher's homemaking during her time at the farm and efforts in making home improvements.

The circuit court similarly considered the value of the property set apart to each spouse – most of the appealed order is spent determining the appropriate value of Billy's retirement accounts and apportioning marital and nonmarital components. It also clearly recognized the length of the parties' marriage of approximately nine years and considered the economic circumstances of each party at the time of the final hearing. While neither party presented any

specific evidence at the hearing regarding their expenses at the time, the circuit court found both to be financially well off and neither provided evidence to the contrary.

Billy finally argues that the circuit court inappropriately allowed the July 2019 phone call to influence its decision, as evidenced by the fact that the circuit court devoted approximately a page and a half (of a total of twenty-six (26) pages) regarding the conversation to its findings, in which it referred to Billy's statements as "vile, derogatory, and domineering." As KRS 403.190 states, the circuit court shall "divide the marital property *without regard to marital misconduct* in just proportions." (Emphasis added.) While we agree that Billy's statements are not to be directly considered in the division of marital property, we recognize that they do provide a general background to the circumstances of the parties' marriage and are relevant to the date the parties separated, which was why Cher initially introduced the conversation. Considering the circuit court ultimately divided all marital property equally to both parties (after apportioning the nonmarital portions), we are not convinced that the circuit court failed to follow its duty to divide the marital property in just proportions.

**II.** **Interest**

Pertaining to the December 18, 2023, order, Billy also argues that the circuit court erred in ordering any post-judgment interest on the $4,880,126 awarded to Cher as an equalization payment from Billy's retirement accounts.

KRS 360.040(1) provides that "a judgment . . . shall bear six percent (6%) interest compounded annually from the date the judgment is entered." It is well established that "all judgments bear interest" which includes judgments entered in dissolution proceedings. *Doyle v. Doyle*, 549 S.W.3d 450, 456 (Ky. 2018); *see also Ensor v. Ensor*, 431 S.W.3d 462, 477 (Ky. App. 2013). Generally, a trial court has some discretion in lowering the amount of statutory interest on an award of an equalization payment ordered as the result of a division of property in a dissolution case "should a balance of the equities support a lower amount." *Doyle*, 549 S.W.3d at 456.

When considering the amount of interest to award in this case, the circuit court noted that Cher should be entitled to any prospective gains of the marital portions of Billy's retirement accounts through the date of the final hearing; however, it recognized that no evidence was proffered on the potential growth rates. As mentioned above, both financial experts testified that calculating any figures for growth through December 2023 was impossible due to the fluctuating market and Billy's intervention in his accounts. Thus, the circuit court

-23-

determined that statutory interest was appropriate. Under the facts at hand, the circuit court did not abuse its discretion in awarding statutory interest.

**III.**     **Attorney's Fees and Costs**

Billy's second appeal is from the circuit court's April 24, 2024, order awarding Cher attorney's fees and costs pertaining to her financial expert. In the case at hand, the circuit court awarded Cher attorney's fees citing to both CR 37.02(3) and KRS 403.220.

CR 37.02(3) states:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

In pertinent part, KRS 403.220 provides:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

The only express requirement for a circuit court to award fees and costs under KRS 403.220 is that it merely consider financial resources of the parties; additional evidence is not necessary. *Poe v. Poe*, 711 S.W.2d 849 (Ky. App. 1986); *see also*

-24-

*Smith v. McGill*, 556 S.W.3d 552, 556 (Ky. 2018) (holding that a financial disparity between the parties is no longer a necessary condition).

In its consideration, a circuit court need not make specific findings regarding financial resources, such as in cases where "[t]he record is replete with circumstances in which the trial court was made aware of each party's financial situation." *Hollingsworth v. Hollingsworth*, 798 S.W.2d 145, 148 (Ky. App. 1990). Additionally, while KRS 403.220 does not exist as a sole means to impose sanctions against another party, a circuit court may still consider "conduct and tactics which waste the court's and attorneys' time and must be given wide latitude to sanction or discourage such conduct." *Gentry v. Gentry*, 798 S.W.2d 928, 938 (Ky. 1990).[13] A trial court's decision regarding an award of attorney's fees in a dissolution action will not be disturbed on appeal absent an abuse of discretion. *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky. 2004).

Billy first argues that the imposition of CR 37.02(3) sanctions was inappropriate because Cher made her request post-judgment. In support, he cites to *Rumpel v. Rumpel*, 438 S.W.3d 354, 367 (Ky. 2014), arguing that a motion requesting sanctions in the form of attorney's fees and costs cannot be made post-judgment. We disagree with his interpretation. *Rumpel* did not hold that a motion

---

[13] While a significant portion of the circuit court's April 24, 2024, order does concern the issuance of sanctions against Billy for his actions, we will not read this to be in conflict with KRS 403.220 considering the sanctions were imposed under CR 37.02(3).

for attorney's fees was required to be made pre-judgment, it specifically held that it is improper for a trial court to rely on a CR 59.05 motion to alter, amend, or vacate to assess additional discovery sanctions against a party on an issue that was not raised pre-judgment. *Rumpel*, 438 S.W.3d at 367. Furthermore, *Rumpel* also stated that "[w]e express no opinion as to the propriety of a sanction had the question been properly raised—had an order compelling updated discovery been granted and defied, for example." *Id.*

*Sub judice*, both Cher and Billy made previous motions concerning discovery compliance and the circuit court reserved the issue of attorney's fees. While the circuit court did not explicitly address the issue of attorney's fees and costs during the December 4, 2023, hearing, or in its December 18, 2023, judgment, Billy's noncompliance with Cher's discovery requests regarding his retirement accounts was raised numerous times before and during the December 4, 2023, hearing. Given the circumstances, Cher was not prohibited from making her motion requesting sanctions under CR 37.02(3) post-judgment.

Billy next contends sanctions are inappropriate because the circuit court made no finding that he actually defied any orders regarding Cher's discovery requests, nor conducted a specific hearing on the issue. In making this argument, Billy states that he complied with Cher's discovery requests, having responded to them and signed the necessary releases pertaining to his retirement

and investment accounts. While Billy is technically correct, we find this argument tenuous. It is abundantly clear from a review of the record that there was missing documentation pertaining to the funds in Billy's retirement accounts; both of Cher's and Billy's financial forensic experts testified that there were thousands of dollars that remained unaccounted for on the date of the hearing. Billy also had ample opportunity to respond to Cher's previous motions to compel discovery, which he did. As mentioned above, Billy's recalcitrance with discovery was brought up numerous times at the December 4, 2023, hearing, so he also had the opportunity to present evidence of his compliance then.

Regarding KRS 403.220, Billy argues that the circuit court did not adequately consider the parties' financial resources at the time of the award.

In this case, the circuit court was clearly aware of the party's financial positions, having just conducted an extensive hearing regarding the party's division of property and their financial positions a few weeks prior. *Cf. Miller v. McGinty*, 234 S.W.3d 371, 374 (Ky. App. 2007) (holding the circuit court erred in relying on information about the parties' financial positions from over two years prior). Under the circumstances, the circuit court did not abuse its discretion in awarding attorney's fees and costs for Cher's financial expert to be paid by Billy.

## CONCLUSION

Accordingly, we reverse the portion of the Shelby Circuit Court's December 18, 2023, order characterizing the $90,083.60 Billy paid towards the farm after the date of the parties' decree of dissolution but before the December 4, 2023, hearing, as marital. It should have been designated as nonmarital and credited toward him pursuant to the formula contained in *Brandenburg*. 617 S.W.2d at 872-73. Furthermore, while we agree that a date subsequent to the parties' bifurcated divorce decree was appropriate to use for a valuation date of the IRA Rollover account, we vacate the circuit court's ultimate division of this account, and remand for further proceedings and orders consistent with this Opinion. While the circuit court may comply with this Opinion with only a review of the existing record, we note that its use of judicial resources shall not be limited if it deems further evidence is needed. Finally, we affirm the remaining portions of the December 18, 2023, order as well as the April 24, 2024, order.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Michelle M. Chalmers
Louisville, Kentucky

BRIEF FOR APPELLEE:

Jason M. Nemes
Jonathan H. Matthews
Louisville, Kentucky